**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HERCULES OFFSHORE, INC., *et al.* | ) Case No. 15-11685 (___) |
| | ) |
| Debtors.[1] | ) |
| | ) |

## DECLARATION OF TROY L. CARSON IN SUPPORT OF FIRST DAY MOTIONS

I, Troy L. Carson, hereby declare under penalty of perjury:

1.      I am the Senior Vice President and Chief Financial Officer of Hercules Offshore, Inc. ("HERO"), a corporation organized under the laws of Delaware, and of each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  I have been employed by HERO since 2007 and have served HERO in my current capacity since November 2014.  Prior to being named Chief Financial Officer, I served as Senior Vice President and Chief Accounting Officer, Chief Accounting Officer, Principal Accounting Officer and Vice President and Corporate Controller.

2.      In such capacity, I am generally familiar with the Debtors' day to day operations, business and financial affairs, and books and records.

3.      Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, or information supplied to me by

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cliffs Drilling Company (8934); Cliffs Drilling Trinidad L.L.C. (5205); FDT LLC (7581); FDT Holdings LLC (4277); Hercules Drilling Company, LLC (2771); Hercules Liftboat Company, LLC (0791); Hercules Offshore, Inc. (2838); Hercules Offshore Services LLC (1670); Hercules Offshore Liftboat Company LLC (5303); HERO Holdings, Inc. (5475); SD Drilling LLC (8190); THE Offshore Drilling Company (4465); THE Onshore Drilling Company (1072); TODCO Americas Inc. (0289); and TODCO International Inc. (6326).

[2]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), filed contemporaneously herewith.

other members of the Debtors' management and the Debtors' advisors.  I am over the age of 18

and am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I

could and would testify competently to the facts set forth herein.

4.    The Debtors have requested a variety of forms of relief in the "first day" motions

and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize

the adverse effects of the commencement of these chapter 11 cases on the Debtors' businesses

and to facilitate confirmation of the *Debtors' Joint Pre-Packaged Plan of Reorganization*

*Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of July 13, 2015 (the "Plan").  I am

familiar with the contents of each of the First Day Motions as well as the Plan and I believe that

the relief sought in those First Day Motions is necessary to permit an effective transition into

chapter 11 and a quick emergence from chapter 11.  I further believe that the relief requested in

the First Day Motions will preserve and maximize the value of the Debtors' estates and assist the

Debtors in achieving an expeditious, successful reorganization.

5.    The successful solicitation of the Plan represents the culmination of negotiations

and consideration of options over the course of more than six months.  During that time, the

Debtors considered and explored the possibilities of new financing and an exchange of existing

notes for new notes, while also negotiating the terms of the Plan with their stakeholders.

Ultimately, with the assistance of their advisors, the Debtors concluded that the Plan created the

best opportunity to maximize the value of their estates and to provide for the long term success

of their business.  As a result of the transactions under the Plan, the Debtors will convert

approximately $1.2 billion of debt into equity, raise $450 million of new capital and provide an

opportunity for existing equity holders (despite the fact that they are more than $500 million out

of the money) to receive a distribution if they do not opt out of the releases under the Plan as

more fully set forth below.  The Debtors have sufficient liquid unencumbered assets to accomplish these goals (subject to any counterclaims or defenses) in these chapter 11 cases without the incurrence of DIP loans.

6.      Part I of this Declaration describes the Debtors' corporate structure and business operations.  Part II describes the Debtors' prepetition capital structure and indebtedness. Part III describes the circumstances leading to the commencement of these chapter 11 cases. And Part IV sets forth the relevant facts in support of each of the First Day Motions.

**Preliminary Statement**

7.      The Debtors and their Non-Debtor Subsidiaries (collectively, "Hercules" or the "Company") are leading providers of shallow-water drilling and marine services to the oil and natural gas exploration and production industry globally.  Hercules operates a fleet of 27 self-elevating, mobile offshore drilling units, or "jackup rigs," including one rig under construction, and 21 self-elevating, self-propelled "liftboat" vessels.  This diverse fleet is capable of providing services such as oil and gas exploration and development drilling, well service, platform inspection, maintenance and decommissioning operations.  HERO, the Company's parent entity, was formed in 2004 and has evolved from a small U.S. Gulf of Mexico offshore drilling operator to an expansive, worldwide enterprise operating in several key shallow-water provinces around the world.

8.      As of the Petition Date, the Debtors have estimated assets with a book value of approximately $546 million net of intercompany claims against and historic investments in, the Non-Debtor Subsidiaries.  As set forth in the Disclosure Statement filed with the Plan, the Debtors have asserted that the going concern enterprise value falls within a range of approximately $535 million to $725 million.  Separately, the Debtors have total liabilities of approximately $1.31 billion, the bulk of which is comprised of unsecured debt obligations under

3

its Senior Notes conservatively exceeding the enterprise value by approximately $500 million. Funded obligations under the Debtors' six outstanding series of Senior Notes equal approximately $1.2 billion in principal amount as of the Petition Date. The Debtors do not have substantial secured debt obligations, as they had not drawn down on a credit facility that had existed for some time prior to the chapter 11 cases. The Debtors have sufficient unencumbered cash on hand to finance their obligations in these chapter 11 cases without the need to obtain a debtor-in-possession loan or consent to use cash collateral. In view of the Debtors' cash position and limited need for additional funds given its current cash position, the Debtors instead terminated the facility and elected to pursue the restructuring under the Plan.

9.    The restructuring transactions contemplated by the Plan will significantly deleverage the Debtors' balance sheet by converting the entire $1.2 billion in principal amount of its Senior Notes into 96.9% of Reorganized HERO's new equity. In addition, despite the fact that the amount of the Debtors' liabilities significantly exceeds the Debtors' enterprise value — by approximately $500 million — thus rendering the equity holders "out of the money," the Plan provides that the other 3.1% of New Common Stock and 100% of the New HERO Warrants[3] will be allocated to those existing equity holders that consent to the voluntary third-party releases set forth in the Plan. Importantly, holders of Allowed General Unsecured Claims will be paid in the ordinary course of business in accordance with ordinary course terms under the Plan subject to any rights or defenses the Debtors may have to all or any portion of such Claims. Effectively, the Plan will reinstate those Claims and leave them unimpaired. The Debtors have also received from certain members of the Steering Group commitments for a new $450 million term loan exit facility to provide liquidity for the continuation of operations following the Effective Date.

---

[3]    The New HERO Warrants will provide existing equity holders that consent to the voluntary third-party releases set forth in the Plan the opportunity to purchase their pro rata shares of up to an additional 20% of the New HERO Common Stock at a per share price based upon a $1.55 billion total enterprise value.

10.     The Plan has very strong support from the Debtors' key stakeholders, as over 99% of holders of Class 3 Senior Notes Claims — the only class entitled to vote on the Plan — voted to accept the Plan.[4]   The Debtors believe that the Plan and the transactions contemplated thereunder will right-size the Debtors' balance sheet, increase their liquidity, and strengthen their go-forward operations, positioning the Debtors for long-term success.

## PART I

### I.      Corporate History and Structure.

11.     HERO was formed in 2004.  HERO is the ultimate parent of forty-two direct and indirect subsidiaries, of which fifteen domestic entities are Debtors in these chapter 11 cases. The remaining twenty-seven are Non-Debtor Subsidiaries, and are foreign entities, with the single exception of Hercules Offshore International LLC, a Delaware limited liability company which is owned by foreign Non-Debtor Subsidiaries and which has not guaranteed the Senior Notes.

12.     The chart attached hereto as Exhibit B illustrates the Debtors' corporate structure as of the Petition Date.

### II.     Overview of Business Operations.

13.     Hercules is a leading provider of shallow-water drilling and marine services to the oil and natural gas exploration and production industry globally.  The Company provides such services to national oil and gas companies, major integrated energy companies and independent oil and natural gas operators.  Through its diverse fleet of jackup rigs and liftboats, its services range from oil and gas exploration, well service, platform inspection, maintenance and decommissioning operations.

---

[4]   *See Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan*, filed contemporaneously herewith.  The Debtors commenced solicitation of the Plan on July 13, 2015.  The deadline for submitting ballots was August 12, 2015.

A.        **Jackup Rig and Liftboat Fleet and Other Assets**

14.        The Company's property consists primarily of jackup rigs, liftboats and ancillary equipment, substantially all of which it owns through various subsidiaries domestically and internationally.  The Debtors and Non-Debtor Subsidiaries own 26 self-elevating mobile drilling units, or "jackup rigs."  The jackup rigs are used primarily for exploration and development drilling in shallow waters.  19 of these jackup rigs are owned by the Debtors, including 18 that operate exclusively in the Gulf of Mexico and 1 that operates in overseas locations.  The remaining 7 are owned by foreign Non-Debtor subsidiaries.  In addition, presently under construction in Singapore is the *Hercules Highlander*, a newbuild jackup rig scheduled to be completed in 2016, which will be owned by a Non-Debtor Subsidiary and for which Hercules has a drilling contract with Maersk Oil North Sea UK Limited ("Maersk"), as described in greater detail below, that goes into effect upon its completion and installation.

15.        In addition, Hercules also owns and operates 19 liftboat vessels, of which 10 are owned by the Debtors.  In addition, Hercules operates 2 liftboats owned by a third party. Liftboats have large open deck space, which provides a versatile, mobile and stable platform to support a broad range of offshore maintenance and construction services throughout the life of an oil or natural gas well.  Hercules' liftboats operate in West Africa and the Middle East.

16.        Hercules maintains offices, maintenance facilities, yard facilities, warehouses and waterfront docks as well as residential premises in various countries, including the United States, United Kingdom, Nigeria, Singapore, Saudi Arabia, United Arab Emirates, Malaysia, and Bahrain.  All of these properties are leased except for an office and a warehouse in the United Kingdom.  The Company's leased principal executive offices are located in Houston, Texas.

6

**B.      Industry Operating Environment and Competition.**

17.      The shallow-water offshore markets in which Hercules operates are highly competitive.  Contracts are typically awarded on a competitive bid basis.  Pricing is often the primary factor in determining which qualified contractor is awarded a job, although technical capability of service and equipment, unit availability, unit location, safety record and crew quality may also be considered.  Certain competitors in the shallow-water business may have greater financial and other resources than Hercules presently has.  As a result, these competitors may have a better ability to withstand periods of low utilization, compete more effectively on the basis of price, build new rigs, acquire existing rigs, and make technological improvements to existing equipment or replace equipment that becomes obsolete.

18.      Competition for offshore rigs is usually on a global basis, as drilling rigs are highly mobile and may be moved, at a cost that is sometimes substantial, from one region to another in response to demand.  However, a number of the Company's jackup rigs are mat-supported, which render them less capable than independent leg jackup rigs of managing variable sea floor conditions found in many areas outside of the Gulf of Mexico.  As a result, the Company's ability to move its mat-supported jackup rigs to certain regions in response to changes in market conditions is limited.    Additionally, a number of competitors have independent leg jackup rigs with generally higher specifications and capabilities than most of the independent leg rigs that Hercules currently operates. Particularly during market downturns when there is decreased rig demand, higher specification rigs may be more likely to obtain contracts than lower specification rigs.

19.      In the face of these market conditions, the Company as a whole has continually sought out opportunities to improve its operations and financial performance.  In this regard, it has looked to sell or scrap underperforming or unutilized assets to convert them to cash or just to

7

reduce the substantial expense associated with owning these assets.  In the months leading up to the chapter 11 cases, the Company has sold 6 unutilized rigs in May and June for aggregate proceeds of $4.5 million.  Separate and apart from the cash proceeds from these transactions, the Debtors will no longer have to shoulder the costs of ownership of these assets.

20.     Additionally, the offshore drilling industry as a whole, and the Company's operations more specifically, are affected in varying degrees by federal, state, local and foreign and/or international governmental laws and regulations regarding the discharge of materials into the environment or otherwise relating to environmental protection.  The industry is dependent on demand for services from the oil and natural gas industry and, accordingly, is also affected by changing tax and other laws relating to the energy business generally.  In the United States, Hercules is subject to the jurisdiction of the Environmental Protection Agency, the U.S. Coast Guard, the National Transportation Safety Board, the U.S. Customs and Border Protection, the Department of Interior, the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement, as well as classification societies such as the American Bureau of Shipping.  The Company's non-U.S. operations are subject to other laws and regulations in countries in which Hercules operates, including laws and regulations relating to the importation of and operation of rigs and liftboats, currency conversions and repatriation, oil and natural gas exploration and development, environmental protection, taxation of offshore earnings and earnings of expatriate personnel, the use of local employees and suppliers by foreign contractors and duties on the importation and exportation of rigs, liftboats and other equipment.  Hercules believes that it is currently in compliance in all material respects with the environmental regulations to which it is subject.

C.      **Customers and Existing Contractual Arrangements.**

21.     The Company individually negotiates its contracts to provide services and they vary in their terms and provisions.  Currently, all of the Company's drilling contracts are on a dayrate basis.  Dayrate drilling contracts typically provide for higher rates while the unit is operating and lower rates or a lump sum payment for periods of mobilization or when operations are interrupted or restricted by equipment breakdowns, adverse weather conditions or other factors.  A dayrate drilling contract generally extends over a period of time covering the drilling of a single well or group of wells or covering a stated term.  Traditionally, most contracts in the U.S. Gulf of Mexico have been on a short-term basis of less than six months.  Contracts in international locations have historically been longer-term, with contract terms of up to five years. Customers may have the right to terminate, or may seek to renegotiate, existing contracts if Hercules experiences downtime or operational problems above a contractual limit, if the rig is a total loss, or in other specified circumstances, which could result in penalties to Hercules.  A customer is more likely to seek to cancel or renegotiate its contract during periods of depressed market conditions.

22.     A liftboat contract generally is based on a flat dayrate for the vessel and crew. Liftboat dayrates are determined by prevailing market rates, vessel availability and historical rates paid by the specific customer.  Under most of its liftboat contracts, Hercules receives a variable rate for reimbursement of costs such as catering, fuel, rental equipment and other items. Liftboat contracts generally are for shorter terms than are drilling contracts.

23.     Hercules calculates its contract revenue backlog, or future contracted revenue, as the contract dayrate multiplied by the number of days remaining on the contract assuming full utilization, less any penalties or reductions in dayrate for late delivery or non-compliance with contractual obligations.  Backlog excludes revenue for management agreements, mobilization,

demobilization, contract preparation and customer reimbursables.  The amount of actual revenue earned and the actual periods during which revenue is earned will be different than the expected backlog due to various factors.  Downtime due to various operational factors, including unscheduled repairs, maintenance, operational delays, health, safety and environmental incidents, weather events and other factors (some of which are beyond the Company's control), may result in lower dayrates than the full contractual rate.  In some of the contracts, the customer has the right to terminate the contract without penalty and, in certain instances, with little or no notice.

24.    The Company's backlog at July 21, 2015, totaled approximately $904,302,000 for its executed contracts, including the Maersk contract for the *Hercules Highlander*. Approximately $67,135,000 of this estimated backlog is expected to be realized during 2015. The following table reflects the amount of the Company's contract backlog for its executed contracts by year as of July 21, 2015:

| | | **For the Years Ending December 31,** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Total** | | **2015** | | **2016** | | **2017** | | **Thereafter** |
| | | | | | (in thousands) | | | | |
| Domestic Offshore | $ | 19,784 | $ | 19,784 | $ | — | $ | — | $ | — |
| International Offshore | | 880,078 | | 42,911 | | 110,919 | | 202,451 | | 523,797 |
| International Liftboats | | 4,440 | | 4,440 | | — | | — | | — |
| Total | $ | 904,302 | $ | 67,135 | $ | 110,919 | $ | 202,451 | $ | 523,797 |

25.    The following are some of Hercules' larger customer contracts:

- *Maersk:*  In May 2014, Hercules British Offshore Limited, a Non-Debtor Subsidiary of HERO, signed a five-year drilling contract (the "Maersk Agreement") with Maersk for the *Hercules Highlander*. Hercules expects performance under the Maersk Agreement to commence in mid-2016.  In support of the Maersk Agreement, in May 2014, Hercules North Sea, Ltd., a Non-Debtor Subsidiary, signed a rig construction contract with Jurong Shipyard Pte Ltd in Singapore with respect to the *Hercules Highlander*. Hercules estimates the shipyard cost of the *Hercules Highlander* at approximately $236 million.  Including project management, spares,

commissioning and other costs, total delivery cost for the *Hercules Highlander* is estimated at approximately $270 million of which approximately $216 million remains to be paid and will be due upon delivery of the rig, which is expected to be in April 2016.[5]

- *Saudi Aramco*:  Hercules has three rigs, *Hercules 261*, *Hercules 262* and *Hercules 266*, under contract with Saudi Aramco.  *Hercules 261* and *Hercules 262* are operating under five-year contracts, each of which is scheduled to terminate in the Fall 2019.  The contract term for the *Hercules 266* is currently scheduled to expire between September 30, 2015 and April 8, 2016, at the discretion of Saudi Aramco. The originally contracted dayrate for *Hercules 261*, *Hercules 262* and *Hercules 266* was approximately $136,000, $118,000, and $125,000 per day, respectively.  In June 2015, Hercules received notice from Saudi Aramco reducing the dayrates for all three rigs to $67,000 per day. The reduced dayrates for *Hercules 261* and *Hercules 262* will apply from January 1, 2015, through December 31, 2016, and will apply from January 1, 2015 through the remaining contract term for *Hercules 266*.

- *Eni Agreement*:  In March 2015, Hercules signed a five-year contract with a subsidiary of Eni S.p.A. for use of the *Hercules 260* in West Africa.  The dayrate under the contract will range from a minimum of $75,000 per day when the price of Brent crude oil is $86 or less per barrel, to a maximum of $125,000 per day when the price of Brent crude oil is $125 or more per barrel.

## III.   Employees.

26.    As of July 31, 2015, Hercules had in the aggregate approximately 1,257 employees. The Debtors employ approximately 776 employees and Non-Debtor Subsidiaries employ approximately 481 employees.  Hercules requires skilled personnel to operate and provide technical services and support for its rigs and liftboats.  As a result, Hercules conducts extensive personnel training and safety programs.  In the course of the last year as a result of prevailing economic conditions, Hercules has reduced its total number of employees.

27.    As of the Petition Date, the Debtors are not parties to any collective bargaining agreements.  Efforts have been made from time to time to unionize portions of the offshore workforce in the U.S. Gulf of Mexico.  Employees of certain Non-Debtor Subsidiaries in West Africa are working under collective bargaining agreements.

---

[5] A substantial portion of the Debtors' exit financing is earmarked to pay the remaining amount.

<u>**PART II**</u>

**I.    Prepetition Capital Structure.**

28.    As of the Petition Date, the Debtors' funded debt consists of approximately $1.2 billion of unsecured Senior Notes issued over time in six series.  The Debtors do not have any institutional secured debt having previously terminated their secured credit facility in June 2015 as there were no amounts drawn under that facility.  The six series of unsecured Senior Notes are as follows:

**A.    April 2019 Notes.**

29.    On April 3, 2012, HERO completed the issuance and sale of $200 million aggregate principal amount of senior notes at a coupon rate of 10.25% with maturity in April 2019 (the "<u>April 2019 Notes</u>").  The April 2019 Notes were sold at par and HERO received net proceeds from the offering of the notes of $195.4 million after deducting the initial purchasers' discounts and offering expenses. Interest on the April 2019 Notes is payable in cash semi-annually in arrears on April 1 and October 1 of each year.

30.    The April 2019 Notes are unsecured obligations of HERO and are guaranteed by each of the Debtor Subsidiaries.  As of the date hereof, the entire $200 million in aggregate principal amount of the April 2019 Notes remains outstanding plus accrued and unpaid interest.

**B.    July 2021 Notes.**

31.    On July 8, 2013, HERO completed the issuance and sale of $400 million aggregate principal amount of senior notes at a coupon rate of 8.75% with maturity in July 2021 (the "<u>July 2021 Notes</u>").  The July 2021 Notes were sold at par and HERO received net proceeds from the offering of the notes of approximately $393 million after deducting the bank fees and estimated offering expenses.  The net proceeds from such offering, together with cash on hand (including the proceeds of approximately $103.9 million HERO received from the sales of

certain inland barge rigs, domestic liftboats and related assets), were used to fund (i) the acquisition of Discovery Offshore S.A., (ii) the final shipyard payments totaling $333.9 million for two jackup rigs, the *Hercules Triumph* and *Hercules Resilience*, (iii) related capital expenditures and (iv) general corporate purposes. Interest on the July 2021 Notes is payable semi-annually in arrears on January 15 and July 15 of each year. The Debtors did not make the most recent interest payment on July 15, 2015 on account of the agreement reached in the RSA (as defined below) and the solicitation of the Plan.

32.    The July 2021 Notes are unsecured obligations of HERO and are guaranteed by each of the Debtor Subsidiaries. As of the date hereof, the entire $400 million in aggregate principal amount of the July 2021 Notes remains outstanding plus accrued and unpaid interest.

**C.    October 2021 Notes.**

33.    On October 1, 2013, HERO completed the issuance and sale of $300 million aggregate principal amount of senior notes at a coupon rate of 7.5% with maturity in October 2021 (the "October 2021 Notes"). These notes were sold at par and HERO received net proceeds from the offering of the notes of approximately $294.5 million after deducting the bank fees and estimated offering expenses. Interest on the notes is payable semi-annually in arrears on April 1 and October 1 of each year.

34.    These October 2021 Notes are unsecured obligations of HERO and are guaranteed by each of the Debtor Subsidiaries. As of the date hereof, the entire $300 million in aggregate principal amount of the October 2021 Notes remains outstanding plus accrued and unpaid interest.

**D.    April 2022 Notes.**

35.    On March 26, 2014, HERO completed the issuance and sale of $300 million aggregate principal amount of senior notes at a coupon rate of 6.75% with maturity in April 2022

(the "April 2022 Notes"). The April 2022 Notes were sold at par and HERO received net proceeds from the offering of the notes of approximately $294.8 million after deducting bank fees and estimated offering expenses. Interest on the April 2022 Notes is payable semi-annually in arrears on April 1 and October 1 of each year.

36.    The April 2022 Notes are unsecured obligations of HERO and are guaranteed by each of the Debtor Subsidiaries. As of the date hereof, the entire $300 million in aggregate principal amount of the April 2022 Notes remains outstanding plus accrued and unpaid interest.

### E.    Legacy Notes.

37.    On April 14, 1998, R&B Falcon Corporation, an entity that was ultimately merged into HERO, issued $250 million of senior notes at a coupon rate of 7.375% with a maturity in March 2018 (the "Legacy Notes").  The Legacy Notes are unsecured obligations of HERO and are not guaranteed by any of the Debtors.  As of the date hereof, approximately $3.508 million in aggregate principal amount of the Legacy Notes remains outstanding plus accrued and unpaid interest.

### F.    Convertible Notes.

38.    In 2008, HERO issued $250 million convertible senior notes at a coupon rate of 3.375% with a maturity in June 2038 (the "Convertible Notes").  The Convertible Notes are an unsecured obligation of HERO and are not guaranteed by any of the Debtors.  As of the date hereof, approximately $7.4 million aggregate principal amount of the Convertible Notes remains outstanding plus accrued and unpaid interest.

## II.    HERO Equity Interests.

39.    As of the Petition Date, HERO common stock was listed for trading on The Nasdaq Global Select Market ("NASDAQ") and approximately 161,639,357 shares of HERO Equity Interests were issued and outstanding.  In March 2015, HERO received a letter from

NASDAQ informing HERO that its common stock was below the minimum bid price requirement for continued listing on NASDAQ.  HERO expects that its common stock will become delisted from trading on NASDAQ following the Petition Date and will then be traded on the OTC Pink market.  If the Plan is confirmed, Reorganized HERO will use reasonable efforts to cause the listing on NASDAQ of the New HERO Common Stock on or as soon as reasonably practicable after the Effective Date.

## PART III

### Events Leading to the Chapter 11 Cases

**I.    Mobile Drilling Rig and Liftboat Market.**

40.    Demand for Hercules' oilfield services is driven by its exploration and production customers' capital spending, which can experience significant fluctuation depending on commodity prices and expectations of future price levels, among other factors.  The recent decline in the price of crude oil has negatively impacted dayrates and demand for Hercules' services.  Additionally, the consolidation of the domestic customer base has negatively impacted demand for jackup rigs in the U.S. Gulf of Mexico.  Hercules understands that, notwithstanding the decline in demand, a number of new jackup rigs are currently under construction around the world and will become available for service in the next three years.  This expected new capacity growth could put further pressure on the international operating environment for the existing jackup rig fleet.  Although activity levels for liftboats are not as closely correlated to commodity prices as Hercules' drilling segments, commodity prices are still a key driver of liftboat demand.  Demand for liftboat services in West Africa has been weak, which Hercules believes has been driven by budgetary constraints with major customers, primarily in Nigeria.

41.    On February 25, 2015, Hercules received a notice from Saudi Aramco terminating for convenience its drilling contract for the *Hercules 261*, effective on or about March 27, 2015.

Hercules received subsequent notices from Saudi Aramco extending the effective date of termination to May 31, 2015.  On June 1, 2015, Hercules received notice from Saudi Aramco reinstating the drilling contract on the *Hercules 261*, in exchange for dayrate concessions on the *Hercules 261*, *Hercules 262* and *Hercules 266* from their existing contracted rates to $67,000 per day.  These reduced dayrates became effective retroactively and were applied from January 1, 2015 through December 31, 2016 for the *Hercules 261* and *Hercules 262*, and through the remaining contract term for the *Hercules 266*.

42.     Hercules has taken numerous actions to mitigate the effects of the decline in activity levels, including but not limited to, significantly reducing: (i) operating expenses by cold stacking nine rigs and warm stacking three rigs since the fourth quarter of 2014; (ii) its capital expenditures planned for 2015; and (iii) its workforce, both onshore and offshore.  Hercules has also looked to dispose of underutilized or under-performing assets to convert them to cash or to eliminate substantial maintenance or other costs associated with retaining them.

## II.     Certain Events that Set the Stage for the Restructuring and the Chapter 11 Cases.

43.     Largely driven by the fluctuation in commodity prices, Hercules, like other companies in the offshore drilling market, has faced challenges as demand for jackup rigs remains weak, while the market is still scheduled to deliver a significant number of newbuild rigs in the next several years.  These challenges are born out in Hercules' recent earnings and utilization statistics for its three business segments, Domestic Offshore, International Offshore, and International Liftboats.

44.     Specifically, revenue generated from Domestic Offshore for the second quarter 2015 decreased 71% to $40.6 million from $140.4 million in the second quarter 2014, driven by lower utilization and dayrates on a reduced marketed rig fleet.  Operating days during the second quarter 2015 declined to 439 days with utilization of 53.6% on a marketed fleet of 9 rigs,

compared to 1,297 days on 18 marketed rigs at 79.2% utilization during the second quarter 2014.

Average revenue per rig per day decreased to $92,538 in the second quarter 2015 from $108,237

in the comparable 2014 period.  Operating expenses of $26.4 million in the second quarter 2015

include a net loss of $3.4 million related to asset sales, including the *Hercules 85*, *153*, *203*, *206*,

*207* and *211*, compared to expenses of $63.5 million in the second quarter 2014, which includes

a gain of $7.4 million from the sale of the *Hercules 250* and *2002*.  The significant reduction in

operating expenses in the current quarter, after adjusting for asset sales, was largely attributable

to the reduced number of fully crewed rigs in operation.  Domestic Offshore reported operating

income of $1.4 million in the second quarter 2015, compared to $57.3 million in the second

quarter 2014, including the aforementioned asset sale gains and losses.

45.    International Offshore revenue of $17.5 million in the second quarter 2015

includes a $13.4 million adjustment related to retroactive dayrate concessions on the *Hercules*

*261*, *262* and *266* made on their existing contracts with Saudi Aramco, and compares to revenue

of $71.7 million in the second quarter 2014.  Utilization decreased to 50.0% in the second

quarter 2015 from 62.5% in the second quarter 2014, largely due to idle time on the *Hercules*

*Triumph, Hercules Resilience* and *Hercules 208*, partially offset by higher utilization on the

*Hercules 261* and *Hercules 260*.  Average revenue per rig per day decreased to $47,975 in the

second quarter 2015 from $157,637 in the second quarter of 2014, driven largely by idle time on

the *Hercules Resilience* and *Hercules Triumph*, lower renegotiated dayrates on the three rigs

working for Saudi Aramco, as well as the retroactive dayrate adjustments on these three rigs.

Operating expense decreased to $35.5 million in the second quarter 2015, from $44.1 million in

the respective 2014 period, which includes a $10.5 million gain on the sale of *Hercules 258*.

This reduction in operating expense was driven in part by lower costs on the *Hercules 261* and

*262* as well as lower costs incurred on the idle rigs.  International Offshore recorded an operating

loss of $40.5 million in the second quarter 2015 compared to operating income of $6.7 million in

the prior year period, including the aforementioned rig sale gain.

46.     International Liftboats revenue declined to $21.2 million in the second quarter

2015 from $30.9 million in the prior year period, due to lower utilization and dayrates.  Second

quarter 2015 utilization declined to 49.7% from 61.0% in the respective 2014 period.  Average

revenue per liftboat per day decreased 16% to $20,329 in the second quarter 2015 from $24,162

in the second quarter 2014, primarily due to market pressure on dayrates.  Operating expenses in

the second quarter 2015 declined by 21% to $15.0 million, compared to $19.1 million in the

second quarter 2014, reflecting lower activity levels and the impact of our cost reduction

measures.  International Liftboats recorded operating income of $0.8 million in the second

quarter 2015 compared to an operating loss of $0.7 million in the second quarter 2014, which

includes approximately $5.3 million of bad debt expense.

**III.     Prepetition Restructuring Initiatives.**

47.     In early 2015, faced with a heavy debt burden and declining revenues, Hercules

hired financial and legal advisors to evaluate a wide range of options to improve Hercules'

financial position in the event of a prolonged market downturn.  Hercules engaged Baker Botts

L.L.P. as its legal restructuring counsel, Lazard Frères & Co. as its financial advisor, and

Deutsche Bank as its investment banker.  In addition, Hercules continued to retain Andrews

Kurth LLP as its general corporate counsel.  Hercules engaged in discussions with potential

financing sources and separately with existing holders of Senior Notes to determine available

options to enhance liquidity, including new financing and deleveraging measures.  It considered

both out-of-court as well as bankruptcy court focused alternatives.  Hercules and its board of

directors carefully considered and weighed each option with the benefit of advice from its financial and legal advisors.

48.      In March 2015, an ad hoc group of holders of Senior Notes — which would ultimately become the Steering Group — formed and hired professionals to advise the group about options to protect their investment in Hercules bonds.  The Steering Group engaged Akin Gump Strauss Hauer & Feld LLP as its legal counsel and the Blackstone Group as its financial advisor at the expense of Hercules by agreement to facilitate negotiations.  Thereafter, Hercules and the Steering Group entered into negotiations regarding a potential restructuring transaction that would allow Hercules to maximize value for all of its stakeholders by substantially reducing its debt burden and securing additional liquidity to help Hercules navigate the current downcycle.

**IV.      The Restructuring Support Agreement.**

49.      On June 17, 2015, after many weeks of intensive negotiations, the Debtors and the Steering Group, who collectively hold in excess of two-thirds of the aggregate principal amounts outstanding under the Senior Notes, entered into the Restructuring Support Agreement (as may be amended from time to time, the "Restructuring Support Agreement" or "RSA"), a copy of which is attached hereto as Exhibit A.  The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, the Steering Group members in connection with a restructuring of the Senior Notes pursuant to the Plan.  The Plan, which will substantially reduce the Debtors' debt burden, solidify the Debtors' long-term growth and operating performance, and provide the Debtors with the financing necessary for their operations going forward, is based on the restructuring term sheet attached to and incorporated by reference in the Restructuring Support Agreement (the "Term Sheet").

50.    The Restructuring Support Agreement as embodied in the terms of the Plan, discussed below, contemplates a value maximizing transaction for Hercules, providing for a balance sheet restructuring while operations continue as usual.  The contemplated new capital structure will provide the best foundation for Hercules to meet the challenges in the global offshore drilling market due to the downcycle in crude oil prices and the expected influx of newbuild jackup rigs over the coming years as well as an opportunity for all of its existing stakeholders to participate in any recovery.

51.    The Term Sheet incorporated as part of the RSA contemplates that the Debtors will reorganize as a going concern and continue their day-to-day operations substantially as currently conducted.  It provides for a substantial reduction in the Debtors' funded debt obligations, including the following principal terms:

(1)  An exchange of $1.2 billion in principal amount of Senior Notes for 96.9% of the New HERO Common Stock.

(2)  A new capital raise of first lien debt with a maturity of 4.5 years and bearing interest at LIBOR plus 9.5% per annum (1.0% LIBOR Floor), payable in cash, issued at a price equal to 97% of the principal amount. The first lien debt will consist of $450 million for general corporate use and to finance the remaining construction cost of the Company's newbuild rig, the *Hercules Highlander*, and will be guaranteed by substantially all of HERO's U.S. domestic and international subsidiaries and secured by liens on substantially all of HERO's domestic and foreign assets.

52.    If the Plan is consummated as proposed, despite the fact that the Debtors' liabilities exceed the Debtors' total enterprise value by at least $500 million, and, therefore, the Debtors' equity holders are substantially out of the money, holders of the HERO Equity Interests will have the opportunity to receive 3.1% of the New HERO Common Stock and warrants to purchase up to another 20% New HERO Common Stock on a Pro Rata basis at a per share price

based on a total enterprise value of $1.55 billion[6] if they do not opt out of the releases set forth in the Plan. The Debtors and the Steering Group have provided this opportunity for holders of HERO Equity Interests to participate in the long-term growth of the Company despite the fact that the equity holders are far "out of the money" (by more than $500 million) to ensure an expeditious and efficient emergence from chapter 11. Thus, for avoidance of doubt, holders of HERO Equity Interests that opt not to grant the releases contained in Article VII.F of the Plan will not receive any distribution whatsoever under the Plan and will miss the opportunity to receive the New HERO Common Stock and the New HERO Warrants. The Debtors distributed notices providing holders of record of existing equity interests the opportunity to opt out on July 17, 2015.[7]

53.     The Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among other things, the appointment of an official committee of equity security holders in the chapter 11 cases; the failure to meet specified milestones related to filing, confirmation and consummation of the Plan; and certain breaches by the parties under the RSA as amended. The milestones referenced above are as follows:

- on or before July 13, 2015, the Debtors were required to commence solicitation of the Plan;

- on or before August 22, 2015, the Debtors were required to commence the chapter 11 cases;

- on or before October 22, 2015, the Court shall commence a hearing to confirm the Plan; and

- on or before November 7, the Debtors shall exit chapter 11.

---

[6] The expiration date for the New HERO Warrants will be six years from the Effective Date of the Plan, subject to earlier expiration upon the occurrence of certain extraordinary events. If the terms for exercise of the New HERO Warrants are not met before the applicable expiration date, then holders of HERO Equity Interests that are entitled to receive such New HERO Warrants will receive only 3.1% of the New HERO Common Stock and will not realize any value under the terms of the Warrants.
[7] A copy of the notice sent to holders of HERO Equity Interests is attached as an exhibit to the Disclosure Statement Scheduling Motion discussed below. *See* Part IV § V below for additional details.

54.     Given the consensus among the majority of holders of Senior Notes, as evidenced by the RSA, the Debtors believe that they will emerge from chapter 11 expeditiously, and with a significantly improved balance sheet that will allow the Reorganized Debtors to succeed in a competitive industry suffering a significant economic downturn.  The Debtors believe, and I agree, that this outcome would be in the best interests of the Debtors, their estates and all stakeholders.

## PART IV[8]

55.     The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure consummation of the Debtors' proposed restructuring transactions.  I have reviewed each of the First Day Motions, including the exhibits thereto.  The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

## I.    All General Creditors Motion.[9]

56.     **Relief Requested**.  The Debtors seek authority, in their sole discretion, to pay Claims of certain Creditors[10] in the ordinary course of business, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships

---

[8]    Capitalized terms in this Part IV of this Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motion.

[9]    *See Motion of Hercules Offshore, Inc., et al., for Entry of an Order Authorizing the Debtors to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business,* filed concurrently herewith.

[10]   As set forth in the General Creditors Motion, "Creditors" are defined to include general unsecured creditors and creditors whose Claims may give rise to liens under certain state and federal laws.

with Creditors.  Additionally, the Debtors seek that the order require that (a) a Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, Customary Terms during the pendency of these chapter 11 cases and (b) if a Creditor, after receiving a payment under the order, ceases to provide its Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor or treat such payment as an avoidable postpetition transfer of property. Finally, the Debtors request that the Court modify the automatic stay to permit the Creditors to proceed with certain, but not all, litigation commenced before the Petition Date against the Debtors as the Debtors deem appropriate.

57.    **The Claims.** The Creditors provide the Debtors goods and services in the ordinary course of business including, among other things, parts, equipment and other supplies, shipping, warehousing, information technology services, financial services, leases of property and equipment, maintenance and repair services, legal services, human resources services, consulting and advisory services and other basic business necessities for the operation of the Debtors' businesses.  Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business that aggregated to approximately $14.54 million per month on average for the twelve months prior to the Petition Date, including $5.19 million per month in obligations to foreign creditors.

58.    The following table contains summary descriptions of the Claims, and the Debtors' estimate of the amounts of the Claims accrued as of the Petition Date, and, of those amounts, the amounts that are due in the ordinary course of business within 21 days of the Petition Date:

| Category | Description of Services Provided | Approximate Amount Accrued as of the Petition Date | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| Operational | Suppliers, service providers and other vendors utilized in operating jackup rigs and liftboats and for related projects. | $6,450,000 | $4,255,000 |
| Administrative | Support services for corporate and administrative functions such as information technology, human resources, legal and accounting. | $675,000 | $250,000 |
| Shipper/Customs | Shippers, warehouseman, customs agents and similar third party providers. | $305,000 | $305,000 |
| Rental/Equipment Lease | Leasing equipment utilized by the Debtors in their operations. | $190,000 | $190,000 |
| **Total** | | **$7,620,000** | **$5,000,000** |

59.     The Debtors estimate that, as of the Petition Date, they owe a total of approximately $7,620,000 on account of undisputed Claims, including approximately $2,235,000 to foreign creditors.  The Debtors are not seeking to pay these amounts immediately; rather the Debtors will pay such amounts as they become due and payable in the ordinary course of the Debtors' businesses.  As of the Petition Date, the Debtors have approximately $81 million in cash on hand.  Cash maintained by the Debtors and the cash generated in the ordinary course of their businesses will provide ample liquidity for payment of the Claims, as well as for the Debtors to conduct operations during the chapter 11 cases and administer the chapter 11 cases.

60.     Although the Debtors have not determined the amount as of the Petition Date, certain of the Claims likely relate to goods delivered to the Debtors within 20 days of the Petition Date.  Additionally, certain Claims in an aggregate amount of approximately $495,000,[11] or approximately 6.5% of the Claims, are held by Creditors that (a) provide shipping, warehousing, and logistics services; (b) repair and maintain the Debtors' equipment and facilities; and/or (c) lease facilities or equipment to the Debtors.

61.     The Debtors have relationships with upwards of 5,000 Creditors that provide the Debtors goods and services needed to run the Debtors' businesses. In many cases, including where a Creditor may itself be facing financial hardship, the Debtors' failure to pay Claims may result in Creditors' stopping work for or deliveries to the Debtors, which may severely disrupt the Debtors' businesses.  That disruption may occur before the Debtors would be able to successfully bring an action in the Court to compel performance or otherwise enforce the automatic stay.  Also, the Debtors interact with the Creditors pursuant to a variety of arrangements, including many arrangements that are not executory in nature.  The counterparty of such an arrangement may not agree to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors and would be under no obligation to do so.

62.     Material disruption to the Debtors' businesses that may result from nonpayment of the Claims could threaten the Debtors' ability to consummate their restructuring.  If the holders of the Claims refuse to transact with the Debtors or limit credit or other trade terms the operations and continued viability of the Debtors' businesses will be jeopardized.

63.     The goods and services the Creditors provide to the Debtors are absolutely necessary for the Debtors to conduct their business in the ordinary course. A Creditor's non-

---

[11]    As of the Petition Date, the Debtors are unaware of any liens that have been asserted by any Creditor on account of such Claims.

performance could materially disrupt the Debtors' ability to operate its vessels and perform other services and harm the Debtors' customer relationships. The Debtors cannot rely on bringing a motion to the Court to compel a Creditor to address potential holdups as its sole means of ensuring uninterrupted supply of goods and services. Having the authority to pay the Claims will greatly help the Debtors ensure a smooth transition into chapter 11 and keep a clear path to consummate the restructuring.

64.     The Debtors are currently engaged in litigation with various Creditors concerning, among other things, intellectual property, regulatory, employment, and workers' compensation matters. Specifically, the Debtors believe that the cost and inconvenience of imposing the automatic stay on certain pending creditor litigation is not justified in light of the fact that the Debtors are seeking to confirm the Plan on an expedited time frame, after which the creditor litigation will resume. The Debtors do not seek this relief in connection with certain derivative litigation and other litigation by equity holders on account of the fact that existing HERO equity holders are more than $500 million out of the money and therefore not entitled to a distribution under the Plan.

## II.     Cash Management Motion.[12]

65.     **Relief Requested**.  The Debtors seek authority to continue to operate their Cash Management System in the day-to-day operation of their businesses, and to honor certain prepetition obligations in accordance with the operation of the Cash Management System. Specifically, the Debtors request authority: (a) to continue to use, with the same account

---

[12]     *See Motion of Hercules Offshore, Inc., et al., for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions, (B) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests, (C) Waiving the Debtors' Compliance with Investment Guidelines Set Forth in Section 345(b) of the Bankruptcy Code and (D) Granting Related Relief,* filed concurrently herewith.

numbers, each of the Bank Accounts; (b) to treat the Debtors' existing Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (c) to conduct banking transactions by all usual means and debit the Bank Accounts on account of all usual items and payment instructions.

66.    Additionally, the Debtors seek authority: (a) to use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to the Bank Accounts, without reference to the Debtors' status as debtors in possession; and (b) to continue the Intercompany Transactions between and among the Debtors and the Non-Debtor Subsidiaries in the ordinary course of business and in accordance with historical practices.  The Debtors further request authority for the Banks: (i)  to continue to maintain, service, and administer the Bank Accounts; (ii) to debit the Bank Accounts in the ordinary course of business on account of (A) all checks drawn on the Bank Accounts that are cashed at the Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (B) all checks or other items deposited in one of the Bank Accounts at the Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (C) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as fees or service charges for the maintenance of any aspect of the applicable Cash Management System.  Finally, the Debtors seek to continue their existing Investment Practices and request that the Court waive the Debtors' compliance with investment guidelines set forth in section 345(b) of the Bankruptcy Code.

67.    **The Cash Management System**. The Cash Management System consists of 62 Bank Accounts located at various Banks.  The Cash Management System is comparable to the centralized cash management system used by similarly situated companies to manage the cash of

operating units in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions. Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly. On average, approximately $10.9 million in receipts and $12.8 million in disbursements flows through the Cash Management System on a weekly basis to service cash received and costs incurred in connection with the Debtors' business operations.

68.     The relief requested in the Motion will help minimize any disruption in Hercules' business operations during the period between the Petition Date and confirmation of the Plan, and preserve the value of the Debtors' estates. Indeed, any disruptions in the Cash Management System could lead to delays in satisfying Hercules' obligations to its vendors and suppliers and meeting the demands of its various customers. In order to avoid the potential erosion of value that could ensue from any such interruptions in Hercules' ordinary course business operations, the Debtors believe it is imperative that they be authorized to continue the Cash Management System consistent with Hercules' historical practice.

69.     Moreover, requiring the Debtors to maintain separate accounts now would decentralize Hercules' Cash Management System because, given Hercules' complex corporate and financial structure, it would be difficult to establish an entirely new cash management system for the Debtors. Indeed, strict adherence to the U.S. Trustee Guidelines would prove to be exceedingly burdensome to the Debtors and their management, reduce efficiencies, and cause

unnecessary expense.  The delays that would result from opening the new accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt Hercules' business operations at this critical time, have little or no benefit to the Debtors' estates, and erode the value of the Debtors' enterprise to the detriment of all stakeholders.

70.     The Debtors receive funds from customers and pay funds to creditors by wire, ACH transfer, and other similar means, as well as by check.  The Debtors also utilize a credit card account through Capital One to pay for travel and other business expenses of its executive and management level employees.  The Debtors and Non-Debtor Subsidiaries also conduct transactions between and among themselves through wires, cash transfers and automated debits and credits.  If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, credit card or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

71.     **The Bank Accounts.**   The funds generated from Hercules' operations are deposited into Bank Accounts associated with the Debtor or Non-Debtor Subsidiary entity that is party to the applicable customer contract.  The majority of the Bank Accounts, and the central locus of the Hercules cash management activities, reside at Amegy Bank of Texas, N.A. ("Amegy").  The Amegy Bank Accounts ultimately concentrate into one of the three master operating accounts associated with the domestic or international regional segment of Hercules' operations.  Funds from these three master operating accounts are then paid directly or transferred back to entity-level Bank Accounts to be disbursed to pay vendors, employees, and other costs associated with the business.

72.     Although the Bank Accounts at Amegy handle the primary in-flows and out-flows of funds associated with the Debtors' operations, Hercules maintains twenty-nine (29) other Bank Accounts of various types and for various purposes at other banking institutions in the United States and abroad.  The Bank Accounts are generally segregated by operating region, such that, to the extent a Bank Account of a Non-Debtor requires additional funds from elsewhere within Hercules, those funds are transferred from another Non-Debtor and funds of a Debtor entity are not transferred to a Non-Debtor Subsidiary, except in certain unusual circumstances (indeed, there has not been a Debtor to Non-Debtor Subsidiary transfer in nearly two years and none is expected during the course of these chapter 11 cases).

A.     Amegy Accounts

73.     The Bank Accounts at Amegy fall under three separate master operating accounts: the master operating account held by Debtor Hercules Drilling Company LLC (the "Domestic Master Account"); the master operating account held by Non-Debtor Hercules Oilfield Services Ltd. (the "HOSL Master Account") and the master operating account held by Non-Debtor Hercules Offshore Middle East Ltd. (the "HOME Master Account", and together with the Domestic Master Account and the HOSL Master Account, the "Master Accounts").  The Master Accounts concentrate and distribute funds to certain associated accounts (the "Sub-Accounts"). The Domestic Master Account concentrates funds from numerous Sub-Accounts associated with the Debtors' domestic operations while the HOSL Master Account and the HOME Master Account each concentrate funds from Sub-Accounts associated with a separate sector of the Non-Debtor Subsidiaries' international operations.

74.     Each of the Master Accounts is, for the most part, self-sustaining, in that it receives sufficient funds from its Sub-Accounts to cover outgoing payments from the Master

Accounts and its Sub-Accounts.  However, in certain unusual circumstances, a Master Account may run low on funds and require additional funds from elsewhere within the overall Hercules enterprise.  If this occurs in either the HOME Master Account or HOSL Master Account, funds from the other will be transferred, such that no Debtor funds will be transferred to a Non-Debtor Subsidiary Bank Account.  If the HOME Master Account or the HOSL Master Account does not have sufficient funds to meet the need, the Domestic Master Account will make the appropriate transfer.  However, such Debtor to Non-Debtor Subsidiary transfers are rare and not only have no such transfers occurred since approximately October 2013, no such transfers are expected or forecasted during the time in which the Debtors contemplate being in chapter 11 (and the Debtors are not requesting authority to make such transfers absent consent of the Steering Group).  Similarly, there are rarely, if ever, Non-Debtor to Debtor account transfers.

1.      *Domestic Amegy Accounts*

75.      The Domestic Master Account is the central operating account associated with the Hercules domestic operations.  The Domestic Master Account collects funds from and disburses funds to ten (10) other Bank Accounts at Amegy (together with the Domestic Master Account, the "Domestic Amegy Accounts") that are held in the name of Debtor entities.  Eight (8) of these Bank Accounts are zero balance accounts that sweep all funds remaining in the account at the end of each day into the Domestic Master Account.  These zero balance accounts receive funds generated from domestic operations, including funds paid to the Debtors in connection with customer contracts, and disburse funds to satisfy domestic payables.  One such account is a payroll account in the name of Hercules Offshore Services LLC, the domestic Debtor entity that employs the Debtors' domestic employees.  The remaining Domestic Amegy Accounts consist of a controlled disbursement accounts payable account and a self-direct investment account, both

in the name of Hercules Drilling Company, LLC.  Periodic payments of interest on the Senior Notes are made directly from the Domestic Master Account.

### 2.    HOSL Amegy Accounts

76.    The HOSL Master Account is the central operating account in the name of Hercules Oilfield Services Ltd., a Non-Debtor Subsidiary, associated with the Hercules' international operations (other than drilling operations in Saudi Arabia, domestically-owned liftboats that operate internationally and international operations of Debtor Cliffs Drilling Company).  The HOSL Master Account collects funds from and disburses funds to eleven (11) Sub-Accounts at Amegy (together with the HOSL Master Account, the "HOSL Amegy Accounts") held in the name of certain Non-Debtor Subsidiaries.  Ten (10) of these Bank Accounts are zero balance accounts that sweep remaining funds at the end of each day into the HOSL Master Account.  These zero balance accounts receive funds generated from international operations, including funds paid to the applicable Non-Debtor Subsidiary in connection with customer contracts, and disburse funds to satisfy payables of such Non-Debtor Subsidiary.  One such Bank Account is a payroll account in the name of Hercules International Offshore Ltd. that is used to pay certain of the Non-Debtor Subsidiaries' international employees.  The remaining HOSL Amegy Account consists of a self-directed investment account held in the name of Hercules Oilfield Services Ltd.

### 3.    HOME Amegy Accounts

77.    The HOME Master Account is the central operating account in the name of Hercules Offshore Middle East Ltd., a Non-Debtor Subsidiary, associated with Hercules' drilling operations in Saudi Arabia.  The HOME Master Account collects funds from and disburses funds to two (2) other Sub-Accounts at Amegy:  (1) a deposit account in the name of Non-Debtor

Subsidiary Hercules Offshore Arabia, Ltd. that receives funds generated from Saudi operations, including funds paid to Hercules Offshore Arabia Ltd. in connection with customer contracts, and disburses funds to satisfy payables related to its operations and (2) a self-directed investment account held in the name of Hercules Offshore Middle East Ltd.

      B.      <u>Non-Amegy Bank Accounts</u>

      78.      *Collateral Accounts*:  HERO maintains a United States-based savings account at HSBC for use in providing cash collateral for letters of credit.  Hercules Drilling Company, LLC maintains a separate restricted cash collateral account at Morgan Stanley Smith Barney in New York.  Historically, this account was used in providing cash collateral for bonds provided in connection with contract bids. It is currently dormant and is in the process of being closed.

      79.      *Foreign Local Operating Accounts*:  Hercules has a number of operating accounts in foreign locations in order to enable it to conduct its business locally.

- Hercules maintains ten (10) local operating accounts with HSBC in the United Kingdom, the United Arab Emirates, Malaysia, India and Saudi Arabia.  With the exception of an Indian account, which is in the name of Debtor Cliffs Drilling Company, these accounts are in the name of Non-Debtor Subsidiaries.

- Hercules maintains three (3) accounts with Citibank located in Trinidad.  Two of these accounts are in the name of Cliffs Drilling Company, a Debtor entity, and one is in the name of TODCO Trinidad Ltd, a Non-Debtor Subsidiary.  The accounts were used to fund local operations in Trinidad, but are now dormant and in the process of being closed.

- Hercules maintains (2) current checking accounts with ING Bank in Luxembourg.  These accounts are in the name of Non-Debtor Subsidiaries Discovery Offshore, S.A. and Discovery Offshore (Gibraltar) Ltd.

- Hercules maintains (2) local deposit accounts with Standard Chartered Bank.  One account is located in Singapore in the name of Hercules Offshore, Inc. - Singapore branch.  The other is in the name of Non-Debtor Subsidiary Hercules International Drilling, Ltd. and is based in Cameroon.

- Non-Debtor Subsidiary Hercules Offshore (Nigeria) Limited maintains (3) deposit accounts with United Bank of Africa in Nigeria.  These are used to conduct operations in West Africa and are in the name of a Non-Debtor Subsidiary.

- Non-Debtor Subsidiary Discovery Offshore (Gibraltar) Ltd. maintains an operating account with the State Bank of India for use in local operations.
- Debtor TODCO Americas, Inc. maintains a deposit account at Bancolombia in Colombia for use in local operations.

C.    <u>Bank Fees</u>

The Debtors pay approximately $20,000 per month in bank fees incurred in connection with the Bank Accounts (the "<u>Bank Fees</u>").  The Debtors pay the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit.  The Debtors estimate that they owe approximately one month in Bank Fees, or $20,000, as of the Petition Date.

80.    The Debtors respectfully request that the Court authorize the banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business as set forth in the Motion.

81.    **Investment Practices**. In the ordinary course of business, Hercules engages in certain investment practices to preserve principal and maintain sufficient liquidity to meet operational objectives, contractual obligations, and debt requirements, while seeking to maximize investment yield, consistent with a strict internal investment policy (collectively, the "<u>Investment Practices</u>").  As part of its Investment Practices and utilizing the Cash Management System, Hercules invests, on an overnight basis, excess funds in the Amegy Master Accounts (i.e., funds that have not otherwise been transferred to other Bank Accounts).  It does so by sweeping such excess funds into three (3) investment accounts at Amegy (the "<u>Overnight Investment Accounts</u>"), one associated with each Amegy Master Account.    The principal investments within the Overnight Investment Accounts are in money market mutual funds, obligations issued by the U.S. Treasury, obligations of a U.S. Federal Agency or U.S. Government sponsored enterprise, auction rate certificates, auction preferred stock, certificates of deposit, commercial paper, municipal securities, corporate debt, repurchase transactions,

variable rate demand obligations, and Eurodollar time deposits. The funds in each Overnight Investment Account are then swept back into each respective Amegy Master Account the following morning.

82.    Additionally, Hercules maintains three (3) investment accounts with Capital One Bank in Houston, each of which is associated with one of the Amegy Master Accounts. Hercules also maintains (2) investment accounts with Comerica Bank in Houston, one in the name of HERO and one in the name of Non-Debtor Subsidiary Hercules Oilfield Services Ltd. Hercules Oilfield Services Ltd. also maintains an investment account at DNB Bank ASA in New York. Finally, Hercules maintains two additional investment accounts at Amegy that are not currently in use.

83.    If the Debtors are limited to direct investments in U.S. government securities, they would need to (i) completely overhaul their existing investment approach and (ii) implement new associated controls and procedures. The risk of a compliance breakdown in connection with these activities is at least as large as any incremental risk posed by investment in the Overnight Investment Accounts, and the costs associated with these activities would likely exceed the yield on the investments. The Debtors are part of a large, sophisticated enterprise, and their operations team has determined that investment in the Overnight Investment Accounts will benefit the Debtors and the value of the Debtors' estates.

84.    Requiring Hercules to change its Bank Accounts, Investment Practices and other components of the Cash Management System would be a significant disruption to Hercules, which relies on the Cash Management System for its business operations. In the context of these chapter 11 cases, where the Debtors have the required support to confirm the Plan and emerge

from chapter 11 on an expedited timeline, the Debtors respectfully request that they should be permitted to continue their Investment Practices and the Cash Management System.

85.    **Business Forms.**  As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

86.    **Intercompany Transactions.** The Debtors and the Non-Debtor Subsidiaries maintain business relationships and engage in transactions with each other resulting in intercompany loans, receivables, and payables in the ordinary course of business (the "Intercompany Transactions" and claims arising from such Intercompany Transactions, the "Intercompany Claims").  The Debtors and Non-Debtor Subsidiaries track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.

87.    Such Intercompany Transactions are frequently conducted, (a) among the Debtors, and (b) among the Non-Debtor Subsidiaries.  Normally, the Debtors do not transfer funds from their Bank Accounts to the Bank Accounts of Non-Debtor Subsidiaries (such

transfers, "Non-Debtor Subsidiary Transfers").  However, Hercules monitors the cash balances of the Master Accounts daily, in light of anticipated cash receipts and payment obligations.  If the funds in one of the Master Accounts is determined to be insufficient to meet anticipated payment obligations, Hercules will, in consultation with its tax team, make a transfer from another Master Account that it deems appropriate.  Generally, if either of the HOME Master Account or the HOSL Master Account requires additional funds, a transfer will be made from the other, such that no funds of a Debtor will flow to a Non-Debtor Subsidiary.  However, on certain rare occasions, including if an event occurs that gives rise to a significant capital expenditure, the funds in the HOME Master Account and the HOSL Master Account may be insufficient to cover their combined payment obligations.  In such instances, funds from the Domestic Master Account may be transferred to the HOME Master Account or the HOSL Master Account.  Although such Non-Debtor Subsidiary Transfers are rare, they are integral to the Hercules enterprise and consistent with Hercules' historical, ordinary-course business practices.  While the Debtors do not anticipate that any transfers from the Domestic Master Account to either of the HOME Master Account or HOSL Master Account, or any other Non-Debtor Subsidiary Transfers, will be necessary during the anticipated short duration of the chapter 11 cases, it requests that such Non-Debtor Subsidiary Transfers be authorized out of an abundance of caution, provided the Debtors will only make such Non-Debtor Subsidiary Transfers with the consent of the Steering Group.

88.    In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and between the Non-Debtor Subsidiaries, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor, one Non-Debtor Subsidiary to

another Non-Debtor Subsidiary or between a Debtor and a Non-Debtor Subsidiary.    Certain Intercompany Claims are settled in cash while most are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.    Under the Plan, Intercompany Claims will be reinstated and paid in the ordinary course.    If Intercompany Transactions were to be discontinued, the Cash Management System, the Debtors' and Non-Debtor Subsidiaries' operations and related administrative controls would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.    Since these transactions represent extensions of intercompany credit made in the ordinary course of business, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order.

89.    More significantly, the relief requested in this Motion will help minimize any disruption in Hercules' business operations during the limited period between the Petition Date and confirmation of the Plan, and preserve the value of the Debtors' estate.    Indeed, any disruptions in the Cash Management System could lead to delays in satisfying Hercules' obligations to its vendors and suppliers and meeting the demands of its various customers.    In order to avoid the potential erosion of value that could ensue from any such interruptions in Hercules' ordinary course business operations, the Debtors believe it is imperative that they be authorized to continue the Cash Management System consistent with Hercules' historical practice.

## III.    Prime Clerk LLC Retention Application Pursuant to Section 156(c).[13]

90.    **Relief Requested**. The Debtors seek entry of an Order approving the Services Agreement between the Debtors and Prime Clerk LLC ("Prime Clerk") and the Debtors'

---

[13] *See Application of Hercules Offshore, Inc., et al., for Appointment of Prime Clerk LLC as Claims and Noticing Agent*, filed concurrently herewith.

retention and employment of Prime Clerk as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware and for related relief, effective *nunc pro tunc* to the Petition Date.

91.     **Services to be Provided**. The retention application pertains only to the work to be performed by Prime Clerk under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c), Local Rule 2002-1(f), and the Claims Agent Protocol, and any work to be performed by Prime Clerk outside of this scope is not covered by the application or by any order granting approval thereof. Specifically, Prime Clerk will perform, to the extent the Debtors request, the following services in its role as claims and noticing agent, as well as all quality control relating thereto:

      a.      prepare and serve required notices and documents in the cases in accordance with the Bankruptcy Rules in the form and manner directed by the Debtors and/or the Court, including, if applicable (i) notice of the commencement of the cases, (ii) notices of transfers of claims, (iii) notices of objections to claims and objections to transfers of claims, (iv) notices of any hearings on a disclosure statement and confirmation of the Plan, including under Bankruptcy Rule 3017(d), (v) notice of the effective date of any plan, and (vi) all other notices, orders, pleadings, publications, and other documents as the Debtors and/or the Court may deem necessary or appropriate for an orderly administration of these chapter 11 cases;

      b.      maintain (i) a list of all potential creditors, equity holders, and other parties in interest, and (ii) a "core" mailing list consisting of all parties described in Bankruptcy Rule 2002 and those parties that have filed a notice of appearance under Bankruptcy Rule 9010;

      c.      maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

      d.      prepare and file or cause to be filed with the Clerk an affidavit or certificate of service for all notices, motions, orders, other pleadings, or documents served within seven business days of service that includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

e.    process all proofs of claim received, including those received by the Clerk's Office, and check said processing for accuracy, and maintain the original proofs of claim in a secure area;

f.    maintain the official claims register for each Debtor (the "<u>Claims Register</u>") on behalf of the Clerk and upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (*e.g.*, secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

g.    implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

h.    record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

i.    relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Prime Clerk, not less than weekly;

j.    upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

k.    monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed, and make necessary notations on and/or changes to the Claims Registers;

l.    assist in the dissemination of information to the public and respond to requests for administrative information regarding the cases, as directed by the Debtors and/or the Court, including through the use of a case website and/or call center;

m.    30 days prior to the close of these cases, to the extent practicable, request that the Debtors submit to the Court a proposed Order dismissing Prime Clerk and terminating Prime Clerk's services upon completion of its duties and responsibilities and upon the closing of these cases;

n.    within seven days' notice to Prime Clerk of entry of an order closing the chapter 11 cases, provide to the Court the final version of the Claims Registers as of the date immediately before the close of the cases; and

o.    at the close of these cases, box and transport all original documents, in proper format, as provided by the Clerk's office, to (i) the Federal

> Archives Record Administration, located at Central Plains Region, 200 Space Center Drive, Lee's Summit, MO 64064, or (ii) any other location requested by the Clerk's office.

92.     The Claims Registers shall be open to the public for examination without charge during regular business hours and on a case-specific website maintained by Prime Clerk.  Prime Clerk shall not employ any past or present employee of the Debtors for work that involves the Debtors' bankruptcy cases and it will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk's Office, section 331 of the Judicial Code, or as it otherwise may be directed by the Court.

## IV.    Joint Administration Motion.[14]

93.     **Relief Requested**.  The Debtors seek entry of the Order directing joint administration of the Debtors' chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Hercules Offshore, Inc.

94.     **The Debtors' Corporate Structure**.  The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and each Debtor's chapter 11 case is pending in the Court.  Thus, the conditions set forth in Bankruptcy Rule 1015(b) for joint administration of these cases are satisfied.  Various Debtors play a role in other Debtors' capital structures, *e.g.*, as guarantors of obligations of the others.  Numerous parties have interests in the cases of multiple Debtors.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  Joint administration of these chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's valuable resources.  Joint administration also will allow the Office of the United States

---

[14] *See Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases*, filed concurrently herewith.

Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  No party in interest will be prejudiced by the joint administration of these chapter 11 cases.

## V.    Disclosure Statement and Plan Scheduling Motion.[15]

95.    **Relief Requested**.  The Debtors seek entry of the Order, (a) scheduling the Confirmation Hearing, (b) establishing the Objection Deadline and approving related procedures, (c) approving the Solicitation Procedures, (d) approving the form and manner of distributing the Notice, and (e) approving the procedures for providing Equity Holders the opportunity to opt out of the voluntary releases set forth in Article VII.F of the Plan, and for certain related relief.

96.    In connection with the foregoing, the Debtors request that the Court approve the following schedule of proposed dates:

| Event | Date |
| --- | --- |
| **Start of Solicitation:** | July 13, 2015 |
| **Voting Record Date:** | July 13, 2015 |
| **Equity Opt Out Record Date** | July 13, 2015 |
| **Equity Release Consent Notice Distribution Date** | July 17, 2015 |
| **Voting Deadline:** | August 12, 2015 |
| **Opt Out Deadline:** | August 12, 2015 |
| **Petition Date:** | August 13, 2015 |
| **Notice Date:** | August 17, 2015 |

---

[15] *See Motion of Hercules' Offshore, Inc., et al., for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Confirmation Hearing Notice, and (E) Approving Procedures for Equity Holders to Opt Out of Releases*, filed concurrently herewith.

| Event | Date |
|---|---|
| **Confirmation Objection Deadline:** | September 16, 2015 at 4:00 p.m. (Eastern Time) |
| **Deadline to File Confirmation Brief and Reply to Plan Objection(s)/:** | September 21, 2015 at 4:00 p.m. (Eastern Time) |
| **Confirmation Hearing:** | September 25, 2015 at 10:00 a.m. (Eastern Time) |

97.     **The Solicitation Procedures**.  The Debtors commenced solicitation of holders of claims regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures and the Bankruptcy Code.  On July 13, 2015, the Debtors caused their solicitation agent, Prime Clerk LLC (the "Solicitation Agent"), to distribute packages containing the Disclosure Statement, the Plan, and ballots (the "Solicitation Packages") to holders of claims entitled to vote to accept or reject the Plan as of the Voting Record Date.  Under the Plan, the only class of claims for each Debtor entitled to vote is Class 3, which consists of holders of the Debtors' Senior Notes.  See Plan Art. III.C.

98.     The Disclosure Statement and ballots delivered to holders of Class 3 claims instructed such holders to follow the instructions contained in the ballots (and described in the Disclosure Statement).  Votes were only solicited from holders that were either Accredited Investors or Qualified Institutional Buyers, and the ballot instructed such holders to complete and submit the ballot to cast a vote to accept or reject the Plan.  The ballots also contained an election, and related instructions, that provided holders of Class 3 Claims that voted to reject the Plan the opportunity to opt out of the releases set forth in Article VII.F of the Plan if they so desired.  Each holder of a Class 3 claim entitled to vote was explicitly informed in the Disclosure Statement and ballot that such holder needed to submit its ballot such that it is actually received

43

by the Solicitation Agent on or before the Voting Deadline in order for its vote to be counted and/or its election to opt out of the voluntary release to be valid.

99.     Holders of Class 3 claims that were neither an Accredited Investor nor a Qualified Institutional Buyer were instructed not to complete the ballot or submit a vote on the Plan. However, those holders were encouraged to, and provided instructions on how to, complete and return the election form attached to the ballot as Exhibit A thereto if they desired to opt out of the releases set forth in Article VII.F of the Plan.

100.     Certain holders of claims and interests (i.e., holders of claims and interests in Classes 1, 2, 4, 5, 6, and 7) were not provided a Solicitation Package because such holders are either: (a), as to Classes 1, 2, 4, 5 and 6 unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code; or (b) as to Class 7, impaired, entitled to receive no distribution on account of such existing HERO Equity Interests under the Plan (despite the distributions to be made in consideration for the releases set forth in the Plan as more fully set forth below), and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

101.     The Debtors' procedures and standard assumptions for tabulating ballots include:

**Votes Not Counted**          – any ballot or master ballot that is illegible or contains insufficient information to permit the identification of the holder of the claim or the interest
– any ballot or master ballot that is not actually received by the Solicitation Agent by the Voting Deadline
– any unsigned ballot or master ballot
– any ballot or master ballot that partially rejects and partially accepts the Plan
– any ballot or master ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan
– any ballot or master ballot superseded by a later, timely submitted valid ballot
– any improperly submitted ballot or master ballot

**No Vote Splitting**          –  holders are required to vote all of their claims within a particular

class either to accept or reject the Plan and are not permitted to
split any votes

102.    **Equity Release Consent Notice.**  In order to provide holders of HERO Equity

Interests the opportunity to opt out of the voluntary releases set forth in Article VII.F of the Plan

and, in doing so, forego the opportunity to receive a pro rata share of the Shareholder Equity

Distribution and the New HERO Warrants (which they are not entitled to under absolute priority

principles), on July 17, 2015, the Debtors caused the Solicitation Agent to deliver the "*Notice of

(A) Non-Voting Status with Respect to the Debtors' Plan and (B) Election to Opt Out of

Voluntary Release of Claims by Holders of HERO Equity Interests*" (the "Equity Release

Consent Notice") to holders of HERO Equity Interests (as of the Voting Record Date) in Class 7

under the Plan.[16]   The Deadline for holders to return the Equity Release Consent Notice was

August 12, 2015 (the "Opt Out Deadline").

103.    The Equity Release Consent Notice provides clear instructions regarding how a

holder of HERO Equity Interests submits its election in order to opt out of the voluntary releases.

Because a holder of HERO Equity Interests that elects not to grant the releases foregoes its

opportunity to receive its pro rata share of the Shareholder Equity Distribution and the New

HERO Warrants, the Debtors have arranged to record the elections to ensure that holders that opt

out of the voluntary releases do not receive a distribution under the Plan.  For holders of HERO

Equity Interests that are held through DTC, those parties that wish to opt out of the Release must

electronically deliver their instruction to opt out through DTC's Automated Tender Offer

Program system.  This involves instructing DTC (through a nominee if applicable) to move the

---

[16] Following the distribution date, the Debtors discovered that certain holders of unvested restricted stock awarded
under the Debtors' equity incentive program (the "Unvested Holders") had not been sent the Equity Release Consent
Notice by their nominee, the third party administrator of the incentive program.  On August 7, 2015, the Debtors
caused the Solicitation Agent to send the Equity Release Consent Notice to the Unvested Holders by overnight
courier.  The Debtors (with the consent of the Steering Committee) will agree to a reasonable extension of the Opt
Out Deadline upon request for any Unvested Holder that requires additional time to review and complete the Equity
Release Consent Notice.

holder's equity position into a segregated CUSIP.  When distributions are made to holders who hold their interest from DTC at or after the Effective Date, holders of HERO Equity Interests in that segregated CUSIP will not receive a distribution.  As set forth clearly in the Equity Release Consent Notice and the Disclosure Statement, the holders that elected to opt out of the voluntary releases and did not revoke their election prior to the Opt Out Deadline will not have the right to sell or transfer their HERO Equity Interests except, to the extent permitted and applicable requirements are met, in certain other limited circumstances.  Holders of HERO Equity Interests that are held directly must return a completed Equity Release Consent Notice to the Solicitation Agent.  The Solicitation Agent will then coordinate with HERO's stock transfer agent to ensure that those parties that opt out do not receive any distributions under the Plan.

104.    These procedures were necessary to ensure that, consistent with the Plan, holders of HERO Equity Interests that elected to opt out of the releases would not receive distributions under the Plan.  Under the circumstances, the procedures employed for distributing, collecting and recording the elections were adequate to provide holders of HERO Equity Interests the opportunity to opt out of the releases set forth in Article VII.F of the Plan and should be approved.

## VI.    Schedules Waiver and Consolidated List of Creditors Motion.[17]

105.    **Relief Requested**. The Debtors seek entry of an order (i) authorizing the Debtors to file (a) a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and (b) a consolidated list of the Debtors' thirty-five (35) largest unsecured creditors; (ii)

---

[17] *See Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) Consolidated List of Creditors and (B) Consolidated List of Debtors' Top Thirty-Five Creditors; (II) Waiving the Requirement to File a List of Equity Security Holders; (III) Extending the Time, and Upon Plan Confirmation, Waiving the Requirement to File Schedules and Statements of Financial Affairs; (IV) Waiving the Requirements to Convene the Section 341(A) Meeting of Creditors; (V) Limiting Notice Required Under Bankruptcy Rule 2002; (VI) Conditionally Waiving (A) the Staffing and Budget Requirements of the U.S. Trustee Fee Guidelines and (B) Any Applicable Requirement to Appoint a Fee Examiner; and (VII) Granting Related Relief, filed concurrently herewith.*

waiving the requirement to file a list of equity security holders; (iii) waiving the requirement, that the Debtors file their Schedules and Statements upon confirmation of the Plan if confirmation occurs on or before November 7, 2015; (iv) waiving the requirement to convene the section 341(a) meeting of creditors if the Plan becomes effective on or before November 7, 2015; (v) limiting notice required under Bankruptcy Rule 2002 to be provided in these cases; (vi) conditionally waiving, to the extent applicable, (a) the budget and staffing requirements of the Large Case Fee Guidelines and (b) any requirement to appoint a fee examiner based on the Debtors' total assets or liabilities; and (vii) granting related relief.

106.    **The Debtors' List of Creditors**. The Debtors have thousands of creditors. The Debtors presently maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these chapter 11 cases. The lists are maintained without regard for which entity a party may have a relationship with. The Debtors believe that the information as maintained in computer files (or those of their agents) may be utilized efficiently to provide interested parties with notices and other similar documents as contemplated by Local Rule 1007-2 on a consolidated basis. Requiring the Debtors to submit Debtor-specific creditor matrices for each of the Debtors would be an unnecessarily burdensome task and would likely result in duplicate mailings. Accordingly, the Debtors request that the request to maintain separate creditor matrices be waived.

107.    Additionally, because the Top 20 Lists of several of the Debtors could overlap, and certain other Debtors may have fewer than twenty identifiable unsecured creditors, the Debtors submit that filing separate Top 20 Lists for each Debtor would be of limited utility. In addition, given the international operations of the Debtors and worldwide location of many of their general unsecured creditors, the exercise of compiling separate Top 20 Lists for each

individual Debtor could consume an excessive amount of the company's limited time and resources, and could constitute a distraction of management's attention otherwise needed on operations through these chapter 11 cases.  Further, the Debtors do not believe that any of their unsecured creditors will be prejudiced if the Debtors file a single list of their thirty-five (35) largest unsecured creditors because the Plan contemplates that the Debtors' unsecured creditors (other than the holders of Senior Notes) will be paid in full.  Finally, the Debtors believe a single, consolidated list of the company's thirty-five (35) largest unsecured, non-insider creditors will aid the Office of the U.S. Trustee in its efforts to communicate with these creditors.

108.    **List of Equity Security Holders.**    The Debtors respectfully submit that the requirements to file a list of equity holders should be waived in these cases.  As of the Petition Date, HERO common stock was listed for trading on The Nasdaq Global Select Market ("NASDAQ") and approximately 161,639,357 shares of HERO Equity Interests were issued and outstanding.  The Debtors submit that preparing a list of HERO's equity security holders with last known addresses and sending notice of all motions and pleadings to such parties would prove extremely expensive and time-consuming and serve little or no beneficial purpose.  HERO filed with its petition a list of holders of five percent or more of HERO's outstanding common stock based on information ascertained from filings with the United States Securities and Exchange Commission (the "SEC").

109.    Even without a list of HERO's equity security holders, the Debtors will be able to serve a combined notice of commencement of the cases and the confirmation hearing on each of HERO's equity security holders.  During the pre-petition solicitation period, the Debtors sent each of HERO's equity security holders the Equity Release Consent Notice, thereby providing HERO's equity security holders with notice of the commencement of solicitation of votes to

accept the Plan, and giving them the opportunity to receive a distribution they are not otherwise entitled to receive.  At that time, the Debtors' proposed notice and claims agent obtained a list of registered holders and nominee holders and coordinated with those parties to provide the Equity Release Consent Notice to all of HERO's equity security holders.  The Debtors intend to send notice of commencement and the confirmation hearing in the same manner.

110.    Further, the equity markets had immediate notice of the execution of the Restructuring Support Agreement, the solicitation of the Plan and Disclosure Statement, and the filing of these chapter 11 cases by the Debtors filing Form 8-Ks with the SEC, and the Debtors' publication of a notice of commencement of the chapter 11 cases on their public website, www.herculesoffshore.com, and the website of the notice and claims agent, http://cases.primeclerk.com/hercules.  Similarly, the equity markets will have immediate notice of material events during the chapter 11 cases by HERO's filing Form 8-Ks with the SEC.  The Debtors will publish notice of the confirmation hearing in the Wall Street Journal (National Edition).

111.    The Debtors other than HERO are all wholly-owned subsidiaries of HERO or another Debtor.  The ownership of these entities will be reflected on the corporate ownership statement filed with their voluntary petitions.  Accordingly, filing a separate list of equity security holders will serve no beneficial purpose.

112.    **Extension and Waiver of Schedules and Statements.**  The Court's grant of an extension of time to file the Schedules and Statements through and including November 7, 2015 is necessary and appropriate in light of the circumstances.  First, the Debtors have thousands of potential creditors and the operation of the Debtors' international businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.  Accordingly,

completing the Schedules and Statements would require the Debtors and their advisors to dedicate substantial time and resources, and at substantial cost, with little or no benefit to the estate and creditors because the Debtors have proposed a prepackaged, "ride through" Plan that has been accepted overwhelmingly by the only impaired voting class. No party in interest would be prejudiced by the Court granting the Debtors' request for an extension through and including the Deadline. General unsecured creditors, priority creditors and any miscellaneous secured creditors are unimpaired under the Plan.

113.     Additionally, in light of the Debtors' substantial, international operations, the Debtors would require an enlargement of the time to prepare the Schedules and Statements. Indeed, the Debtors would expect to be in a position to file the Schedules and Statements at approximately the same time that the Debtors expect to emerge from chapter 11.

114.     **Waiver of Section 341(a) Meeting.**  The purpose of a Section 341 Meeting is to provide parties in interest with a meaningful opportunity to examine a debtor and obtain important information about the debtor. In these cases, however, the Plan was solicited prior to the Petition Date and has overwhelming support from the Debtors' key stakeholders, as over 99% of holders of Class 3 Senior Notes Claims—the only class entitled to vote on the Plan— have voted to accept the Plan. Further, the holders of General Unsecured Claims are unimpaired under the Plan. Therefore, parties are not likely to receive any benefit from a Section 341 Meeting. The Debtors filed these chapter 11 cases to implement and effectuate the Plan and the Debtors solicited the requisite acceptances of the Plan prior to commencing these chapter 11 cases. The Debtors intend 11 to proceed expeditiously to confirm the Plan and emerge from chapter as quickly as possible. Accordingly, waiver of the Section 341 Meeting is justified under the circumstances.

115.   **Limit Notice to Foreign Vendors.**  In the ordinary course of the Debtors' global business, the Debtors receive goods and services from both domestic and foreign vendors.  While the Debtors have made a good faith effort to compile a consolidated list of their respective creditors, the Debtors do not possess the notice information for certain foreign vendors, and dedicating company resources to researching such notice information would unnecessarily expend the Debtors' resources and distract the Debtors' management during these chapter 11 cases.  Here, it is appropriate to limit notices required under Bankruptcy Rule 2002 to those creditors for which the Debtors are able to determine notice addresses after expending reasonable, good faith efforts.

116.   **Waiver of U.S. Trustee Fee Guidelines.**  The Debtors submit that, under the circumstances of these cases, the budget and staffing requirements of the Large Case Fee Guidelines would be unduly burdensome and would not serve their intended purpose.  Indeed, the "watchdog" function in these cases is being effectively performed by the Steering Group, the members of which will hold a majority of the equity of HERO upon emergence.  Accordingly, the Debtors seek a limited, conditional waiver of the budget and staffing requirements of the Large Case Fee Guidelines.

117.   The Debtors have filed these cases with a prepackaged chapter 11 plan, under which all General Unsecured Claims "ride through" unimpaired.  The Debtors intend to emerge from chapter 11 within 45 days of the Petition Date.  Additionally, unlike the vast majority of debtors in chapter 11, the Debtors in this case have no secured debt.  As a result, the Debtors are not seeking debtor-in-possession financing or the use of cash collateral, and, therefore, have not formulated a DIP or cash collateral budget from which to base a budget under the Large Case Fee Guidelines.  For these reasons, formulating a budget and staffing plan would be unduly

burdensome.  Moreover, the budget and staffing plan would have very limited or no utility if the cases go according to design.  The Debtors are not seeking procedures for interim compensation because, due to the expected brief duration of these cases, the first monthly applications would be filed at around the time the Debtors exit chapter 11, and the first quarterly interim applications would not be due until after final applications are due under the Plan.  Therefore, the oversight, forecasting, and predictive functions of the budget and staffing plans would serve no beneficial purpose in these cases.

118.    Accordingly, the Debtors submit that a limited waiver of the staffing and budget requirements is appropriate, conditioned on the Plan being confirmed by the Deadline.  If the Plan is not confirmed by the Deadline, then the Debtors' professionals will work with the U.S. Trustee to provide appropriate budgets and staffing plans as applicable.

119.    In addition, by general order or by practice, certain of the judges in this district require the appointment of a fee examiner or fee auditor when the assets or liabilities of the debtor exceed a certain threshold, typically $100 million.  Due to the expected limited duration of these cases, and for the other reasons discussed above, the Debtors respectfully request a limited waiver of any applicable general order requiring appointment of a fee examiner or fee auditor, conditioned on the Plan being confirmed by the Deadline.

## VII.    Taxes Motion.[18]

120.    **Relief Requested**.  The Debtors seek authority, but not direction, to pay outstanding Taxes.  More specifically, in order to avoid irreparable harm to their estates, the Debtors seek interim authority to pay Taxes that are past due or that will come due within the first 21 days after the Petition Date.  The Debtors also seek authority to remit and pay any Taxes,

---

[18] *See Motion of Hercules Offshore, Inc., et al., for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to Pay Certain Taxes*, filed concurrently herewith.

regardless of whether those amounts accrued before the Petition Date, in the ordinary course of business.  For the avoidance of doubt, the authority requested pursuant to this Motion would be completely discretionary (but upon consultation with the Steering Group) and without prejudice to the Debtors' rights to contest the amounts of any Taxes on any grounds they deem appropriate.

121.    **The Taxes**.  In the ordinary course of business, the Debtors (a) incur sales and use, income, property, and other taxes (collectively, the "Taxes") in the operation of their businesses; and (b) pay or remit such Taxes to various taxing and other governmental authorities (collectively, the "Authorities").  The Debtors pay or remit, as the case may be, the Taxes as incurred or monthly, quarterly, semiannually, or annually to the respective Authorities, as required by applicable laws and regulations.  As of the Petition Date, the Debtors estimate that approximately $678,000 relating to the prepetition period will become due (i.e., it was not due as of the Petition Date) and owing to the Authorities in the ordinary course of business.

122.    **Income Taxes.**  As a result of their operations throughout the world, the Debtors incur income tax liabilities in various jurisdictions (collectively, the "Income Taxes").  The Debtors estimate that their prepetition income tax liability is approximately $642,000.[19]  The majority of the $642,000 amount is owed to revenue authorities in Kuwait, Saudi Arabia, and Singapore.

123.    **Sales Taxes.**  In certain states, the Debtors also incur sales taxes (collectively, the "Sales Taxes") due to the purchase or sale of goods or taxable services within those jurisdictions.  Sales Taxes are due monthly.  The Debtors are seeking authority to pay any Sales Tax amounts that are past due or due within the first 21 days of these chapter 11 cases.  If the Debtors do not

---

[19] This amount has not been paid yet, but is not delinquent—i.e., it is scheduled by the Debtors to be paid in the ordinary course after the Petition Date.

pay the prepetition Sales Taxes to the applicable Authorities when due, these Authorities may assess immediate, irreversible penalties for failure to make a timely payment. Such penalties may be entitled to priority treatment under Bankruptcy Code section 507(a)(8)(G).

124.    **Ad Valorem Taxes.**  The Authorities also impose Taxes on the Debtors relating to property that the Debtors own for the operation of their businesses ("Ad Valorem Taxes"). The Debtors accrue Ad Valorem Taxes on a monthly basis.  As of the Petition Date, the Debtors do not owe any Ad Valorem Taxes.  However, the Debtors are seeking authority, upon entry of the Final Order, to pay the Ad Valorem Taxes as and when they become due during these chapter 11 cases.  In 2015, the Debtors have accrued approximately $84,000 monthly in Ad Valorem Taxes.  The Debtors believe that no Ad Valorem Taxes will become due during the pendency of these cases.  If the Debtors do not pay the Ad Valorem Taxes to the applicable Authorities when due, these Authorities will immediately assess substantial, irreversible penalties for failure to make timely payment.  In addition, nonpayment of Ad Valorem Taxes when due might allow the applicable Authorities to impose liens on the Debtors' property under Bankruptcy Code section 362(b)(18).

125.    **Franchise Taxes.**  The Authorities also impose franchise taxes on the Debtors (the "Franchise Taxes").  Franchise Taxes accrue annually, or in some cases, quarterly.  As of the Petition Date, the Debtors do not owe any outstanding Franchise Taxes.  The Debtors are seeking authority, upon entry of the Final Order, to pay the Franchise Taxes as and when they become due during these chapter 11 cases.  The Debtors believe that approximately $36,000 in Franchise Taxes will become due during the pendency of these cases.

126.    **Miscellaneous Taxes.**  Finally, the Debtors also incur and pay in the ordinary course of operating their businesses certain stamp fees, regulatory assessments, permitting fees,

licensing fees, levies, and other miscellaneous Taxes (collectively, the "Miscellaneous Taxes"). The Debtors believe that the continued payment of the Miscellaneous Taxes, including any such taxes due and owing on account of prepetition Miscellaneous Taxes, are a necessary cost of continuing to operate their businesses. Accordingly, the Debtors request authority to pay any such amounts, including Miscellaneous Taxes that accrued pre-petition, as they come due in the ordinary course of business. The Debtors believe that approximately $90,000 in Miscellaneous Taxes will become due during the pendency of the cases.

## VIII.    Utilities Motion.[20]

127.    **Relief Requested**. The Debtors seek interim and final orders (i) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Companies' requests for additional or different adequate assurance; and (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion.

128.    **The Utility Providers**. In connection with the operation of their business, the Debtors obtain electricity, natural gas, water, telephone, internet, and/or other similar services (the "Utility Services") from a number of utility companies or their brokers (the "Utility Companies"). The Debtors do not pay for any Utility Services that are provided to their Non-

---

[20] *See Motion for Hercules Offshore, Inc., et al., for Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment*, filed concurrently herewith.

Debtor Subsidiaries, and the Debtors' Non-Debtor Subsidiaries do not pay for any Utility Services provided to the Debtors.

129.    Historically, the Debtors have paid all amounts owed to the Utility Companies on a timely basis.  Moreover, to the best of their knowledge, there are no defaults or arrearages of any significance with respect to the Debtors' undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.  In the six month period prior to the Petition Date, the Debtors paid an average of approximately $335,923 per month on account of Utility Services on an aggregate basis.  The Debtors estimate that their cost for Utility Services during the next thirty days (not including any deposits to be paid) will be approximately $392,500.  Currently, the Utility Companies hold no deposits on account of the Debtors' Utility Services.

130.    Continuous Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' chapter 11 cases.  The Debtors' operations include, among other things, operating, repairing and restocking their mobile offshore rigs and vessels, which require, among other things, fuel, water, electricity and telecommunications.  Additionally, the Debtors must perform corporate and administrative functions in their Houston executive offices, which require electricity, telecommunications and other standard utility services.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts.  It is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

131.    **The Proposed Adequate Assurance**. The Debtors intend to timely pay all postpetition obligations owed to the Utility Companies and the Plan provides for reinstatement of

all such obligations and payment in the ordinary course.  The Debtors expect that available funds will be more than sufficient to pay all such obligations.  To provide adequate assurance of payment to the Utility Companies, the Debtors submit that an amount equal to one-half of one month's Utility Service payment (calculated as a historical average over the past six months), together with the Debtors' ability to pay for future Utility Services in the ordinary course of business provides sufficient adequate assurance of payment and that no additional deposit, security, or other assurance of payment is or should be required for the Utility Services.

132.    Pursuant to the procedures outlined below, the Debtors propose to deposit $167,961.50 (the "Adequate Assurance Deposit") into a newly created, segregated, interest-bearing account (the "Adequate Assurance Account") within 20 days of the Petition Date for the benefit of the Utility Providers, pending further order of the Court.  The amount of the Adequate Assurance Deposit equals approximately 50 percent of the Debtors' average monthly cost of the Utility Services during the six month period prior to the Petition Date.  The Debtors submit that the creation and maintenance of the Adequate Assurance Account, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in satisfaction of section 366 of the Bankruptcy Code.  If any Utility Company believes additional assurance is required, they may request such assurance pursuant to the procedures set forth below.

133.    The amounts of the average monthly billings for Utility Services provided by the Utility Companies are relatively modest in the context of these chapter 11 cases and the Debtors' business, totaling approximately $335,923 per month, and the accrued amounts for the prepetition period are likewise minimal.  Moreover, the Plan proposes that all claims will be

reinstated and paid in the ordinary course.  Therefore, the Debtors request authority to make payment in full on the next bill issued in the ordinary course by its Utility Companies, including for any "stub" period for services provided during the pre-petition period.

134.    The relief requested in the Utilities Motion will ensure that the Debtors' operations will not be disrupted by the termination of vital Utility Services or the requests by the Utility Companies of unnecessarily large deposits that could endanger the Debtors' liquidity. Without the requested relief, any interruption in services by the Utility Companies could bring the Debtors' businesses to an immediate halt.  Even if the Utility Companies did not interrupt their services, without the requested relief the Debtors could be forced to address numerous requests by Utility Companies during a critical period in these chapter 11 cases and during a time when their efforts should be more productively focused on developing strategic alternatives to emerge from bankruptcy.  At the same time, the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional or different adequate assurance.

## IX.    Wages and Benefits Motion.[21]

135.    **Relief Requested**.  The Debtors seek authority (but not direction) (a) to pay the prepetition Payment and Program Obligations, up to the priority expense limit imposed on employee claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code; (b) to continue paying the Payment and Program Obligations in the ordinary course of business; (c) to continue to offer, honor, and facilitate the Employee Programs in the ordinary course of business during the pendency of the chapter 11 cases; and (d) to reissue checks, wire transfers, automated

---

[21] *See Motion of Hercules Offshore, Inc., et al., for Interim and Final Orders Authorizing, but not Directing, the Debtors to (I) Pay Prepetition Wages, Salaries and Other Compensation, (II) Pay Prepetition Payroll Taxes and Benefits and Continue Benefit Programs in the Ordinary Course, and (III) Direct Banks to Honor Checks for Payment of Prepetition Employee Payment and Program Obligations,* filed concurrently herewith.

clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition. They also ask the Court to direct all banks to honor the Debtors' prepetition and postpetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of the Payment and Program Obligations.

136.    **The Employees**. As of the Petition Date, the Debtors employ or are responsible for funding the payroll obligations for approximately 776 people (the "Employees"). Some of the Employees provide local support in the Debtors' U.S. offices or foreign branch offices, while other Employees are currently deployed on offshore projects. All of the Employees are hired through debtor Hercules Offshore Services, LLC. The Debtors also contract with five independent contractors (the "Independent Contractors") for various services. Some of the Independent Contractors are former Employees of the Debtors. The Non-Debtor Subsidiaries employ approximately 481 foreign employees, but such employees are not covered by this Motion because the Non-Debtor Subsidiaries have not commenced chapter 11 cases.

137.    Payroll for Employees is handled through the Debtors' Houston-based payroll system. Some Employees are paid on an hourly, weekly basis (the "Hourly Offshore Employees"); some are paid on an hourly, bi-weekly basis (the "Bi-Weekly Arrears Employees); and the rest are paid on a salaried, bi-weekly basis (the "Salaried Employees"). Hourly Offshore Employees are paid on Fridays for the one-week period concluding on the previous week's rig-specific crew change day. Bi-Weekly Arrears Employees are paid every other Friday for the two-week period concluding on the Saturday of the previous week. Salaried Employees are paid every other Friday for the two-week period concluding on the Saturday after the pay date.

138.    In providing benefits to the Employees, the Debtors pay and incur a number of obligations such as compensation, deductions and payroll taxes, incentive programs, equity plans, severance programs, reimbursement expenses, relocation expenses, health benefits, workers' compensation benefits, vacation time, life insurance, accidental death and disability benefits, and other benefits, including employee contributions, claims and administrative fees to benefit providers, which the Debtors have historically provided and funded in the ordinary course of business. The Debtors seek authority to pay Employee compensation-related obligations, including wages, salaries, expense reimbursements, benefit obligations, and related fees, deductions and withholdings, including payroll taxes as provided in the Wages and Benefits Motion.

139.    I believe the vast majority of the Employees rely exclusively on their compensation to pay their daily living expenses.  Both wages and the benefit programs discussed in further detail in the Wages and Benefits Motion are critical components of the Employees' total compensation package, and if the Debtors are not permitted to honor their outstanding Employee obligations, I believe many Employees will be exposed to significant financial difficulties. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale will be jeopardized at a time when Employee support is critical. Any resulting loss in workforce could significantly hinder the Debtors' efforts to successfully reorganize.

140.    The Debtors also have various Employee programs and obligations that are administered or paid through third-party administrators, agents, consultants, or providers. The Debtors seek authority to pay any prepetition fees of these third parties and to continue such payments post-petition in the ordinary course of their business, in order to insure the uninterrupted delivery of payments or other benefits to the Employees.

141.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business during these chapter 11 cases without disruption so as to avoid immediate and irreparable harm to Debtors' estates. Accordingly, I respectfully submit that the Wages and Benefits Motion should be approved.

## X.    Insurance Motion.[22]

142.    **Relief Requested.**  The Debtors seek authority (but not direction) to make the payments required to continue their Insurance Program, including payment of any pre-petition premiums, deductibles or other obligations under the Policies, and to continue post-petition their practice of paying brokerage fees and premiums to the Brokers and any other broker and agent engaged by the Debtors.

143.    **The Insurance Program**.  In the ordinary course of their businesses, the Debtors maintain an insurance program (the "Insurance Program") that provides millions of dollars of coverage for, among other things, the Debtors' operations around the globe, their offshore vessels, general liability, property casualty, and directors' and officers' liability (collectively, the "Policies").  As of the Petition Date, the Debtors are current on their premiums and there are no outstanding premiums due that have not been paid.

144.    The premiums the Debtors pay to procure and maintain the Insurance Program consist of certain premiums that are fixed at the beginning of the policy year and additional premiums that vary based on circumstances during the year.  The Debtors pay approximately $18,492,672 in the aggregate for the fixed component of the premiums.  Although the fixed portion of the premiums due on many of the Policies has already been paid in full for the current

---

[22] *See Motion of Hercules Offshore, Inc., et al., for Authorization to: (1) Continue Pre-Petition Insurance Program and (2) Pay Any Pre-Petition Premiums and Related Obligations*, filed concurrently herewith.

policy year lasting through May 2016, certain other Policies expire on September 30, 2015 and will need to be renewed. For those policies, the Debtors will need to make annual premium payments during the chapter 11 cases, as follows:

| Policies | Payment Due | Total Estimated Annual Premium Amount |
|---|---|---|
| Workers Compensation Employers Liability | October 1, 2015 | $76,000.00 |
| United States Longshoremans & Harbor Works Act | October 1, 2015 | $34,000.00 |

145.    Certain of the Debtors other policies are paid in quarterly installments over the course of the policy year rather than in one annual payment. Consequently, the Debtors anticipate that they may be required to make one or more premium installment payments during the chapter 11 cases, including the following:

| Policies | Payment Due | Total Installment Amount |
|---|---|---|
| Marine Package War Risks Excess Liability ($75M xs $25M) Excess Liability ($100M xs $100M) | October 1, 2015 | $2,835,134 |
| General Liability Employee Benefits Liability Automobile Liability | October 1, 2015 | $14,412 |

146.    The remaining component of the Insurance Program premiums varies based on the Debtors operations, specifically the utilization of their jackup rigs and liftboats. The amount of this operations-dependent portion is determined, assessed and paid quarterly. For the current policy year, the Debtors expect that the aggregate amount of the variable portion of their policy premiums will total approximately $6,086,000, of which a payment that the Debtors estimate will be in the approximate amount of $938,000 will be due on August 21, 2015.

147.    In addition, prior to the Petition Date, the Debtors purchased additional tail coverage for its seven existing Directors & Officers Policies in anticipation of the change in board membership that will occur upon the consummation of the Plan.  The tail covers a six year period following entry of an order confirming a plan of reorganization in these chapter 11 cases. The Debtors paid premiums of $1,350,028 in the aggregate for the additional coverage.

148.    The Debtors' Insurance Program is managed through two insurance brokers, Lockton Companies and Newman Martin and Buchan LLP (the "Brokers").  The Brokers assist the Debtors in determining the appropriate type and amount of insurance coverage for their business and assets and then negotiate with insurance companies to procure the optimal policies. The Premiums are generally paid to the Brokers who then remit such payments to the Carriers. The Brokers are paid annual fees.  For the current policy year, brokerage fees in the amount of $600,000 for Lockton and $425,000 for Newman Martin and Buchman were paid in June 2015.

149.    Certain of the Policies provide coverage protecting the Debtors' Non-Debtor Subsidiaries and their assets.  Specifically, the Debtors' Marine Package policies cover all of the jackup rig and liftboat vessels owned by both the Debtors and the Non-Debtor Subsidiaries.  The Debtors, in the ordinary course of their business, pay the required premiums and accounts for their Non-Debtor Subsidiaries' share of the Marine Package policies' premiums through the creation of intercompany obligations owed to a Debtor by the relevant Non-Debtor Subsidiary. By obtaining the required insurance coverage for the company on a combined basis, the Debtors have been able to realize substantial savings and efficiencies in the cost of their Insurance Program.  In the areas that these Policies cover, including (a) hull & machinery claims, (b) vessel pollution claims, (c) personal injury claims, and (d) third-party liability claims, it would not be feasible to separate out the Debtors'  operations and other insurance needs from those of their

Non-Debtor Subsidiaries and obtain new separate insurance coverage for the Debtors and the Non-Debtor Subsidiaries, respectively, at a reasonable cost or within a reasonable time frame without exposing the Debtors and their operations to significant risk of disruption and increased expense from any material disruption of the Insurance Program.

150.   It is essential to the continued operation of the Debtors' business and reorganization that the Insurance Program be maintained on an ongoing and uninterrupted basis.

## XI.   Motion to Assume Restructuring Support Agreement.[23]

151.   **Relief Requested.**   The Debtors seek authority pursuant to sections 105(a), 363(b)(2) and 365(a) of the Bankruptcy Code to (i) assume the Restructuring Support Agreement, and (ii) pay and reimburse the Steering Group Fees and Expenses in accordance with the terms of the Restructuring Support Agreement.

152.   **Assumption of the Restructuring Support Agreement**.   The Debtors have determined, in the exercise of their business judgment, that it is critical to the execution of the Plan to assume the Restructuring Support Agreement as expeditiously as possible.   The Restructuring Support Agreement, among other things, provides that an overwhelming majority of the holders of Senior Notes — the only impaired class of claims entitled to vote on the Plan — will, subject to the terms and conditions of the Restructuring Support Agreement, support the Plan (having voted for it) and by not challenging any aspect of it during the pendency of the chapter 11 cases.   The Restructuring Support Agreement contains a number of critical agreements that benefit the Debtors and the holders of the Senior Notes to facilitate the chapter 11 cases.   Thus, the relief that is sought through this Motion with respect to the Restructuring Support Agreement will allow the Company to expeditiously confirm the pre-packaged Plan and

---

[23] *See Motion of Hercules Offshore, Inc., et al., for Authorization to (I) Assume Restructuring Support Agreement and (II) Pay and Reimburse Related Fees and Expenses*, filed concurrently herewith, and for which the Debtors seek expedited consideration approximately seven days after the Petition Date.

to implement the restructuring contemplated thereby. Indeed, without the Restructuring Support Agreement and the support of the Steering Group Members, it would be far more expensive, difficult and time-consuming — and potentially impossible — for the Debtors to reorganize successfully.

153.   The Debtors believe that the restructuring transactions contemplated in the Restructuring Support Agreement and to be implemented through the Plan represent the best possible alternative under the circumstances. Importantly, however, in the unlikely event that a better alternative to the proposed restructuring transactions were to present itself, the Restructuring Support Agreement provides that the Debtors may terminate the Restructuring Support Agreement in the proper exercise of their fiduciary duties.

154.   Given the significance of the support of the Steering Group Members to confirmation of the Plan, the Debtors have determined that obtaining Court approval to assume the Restructuring Support Agreement is in their best interests and in the best interests of their estates. Each constituency of the Debtors' stakeholders benefits from the terms of the Restructuring Support Agreement. The Restructuring Support Agreement is a product of arm's length-good faith negotiations among the Debtors and the Steering Group. Furthermore, the signing of the Restructuring Support Agreement was undertaken only after careful consideration by the Debtors' management and board of directors in consultation with their financial and legal advisors, following lengthy exploration of various alternative restructuring strategies both in court and out of court. The Debtors believe that, in light of all of the facts and circumstances of these chapter 11 cases, the terms of the Restructuring Support Agreement are fair, reasonable and appropriate. Moreover, they are integral to assuring that the Debtors can maximize the value of their estates for all of their stakeholders.

155.    **Payment of the Transaction Expenses is Fair and Reasonable**.  The Debtors believe that the provisions of the Restructuring Support Agreement providing for the reimbursement of the Steering Group Fees and Expenses are fair and reasonable and should be satisfied in accordance with the terms and conditions of the Restructuring Support Agreement. The commitments of the Steering Group Members under the Restructuring Support Agreement have been, and will be, of direct benefit to the Debtors, their estates and the future success of the chapter 11 cases.  The foregoing parties have been integrally involved in the negotiation and formulation of the proposed Plan and its key terms and, absent their support, it would be extremely difficult (if not impossible) for the Debtors to successfully reorganize.   These reimbursement provisions are designed to compensate the Steering Group for its expenses in negotiating the various agreements and arrangements outlined in the Plan, along with the financial risk they are undertaking to aid the Debtors in their restructuring efforts.  The Debtors believe that the reimbursement of the Steering Group Fees and Expenses under the Restructuring Support Agreement is consistent with "market" practice and standard in similar agreements and reflects an exercise of their sound business judgment.

156.    Moreover, because all creditors of the Debtors other than holders of Senior Notes are being paid in the ordinary course of business during the pendency of these chapter 11 cases and are unimpaired under the Plan, payment of the Steering Group Fees and Expenses as they come due does not prejudice the Debtors' other creditors.  In addition, as a result of the work by the Steering Group and its professionals, the Debtors were able to negotiate a return for the Debtors' equity holders despite the fact that the total enterprise value of the Debtors is more than $500 million less than the value of the claims against the Debtors' estates.  Accordingly all

parties and stakeholders of the Debtors benefit from the existence and assumption by the Debtors of the RSA and it represents a proper exercise of the Debtors' business judgment.

## XII.    Motion to Assume Exit Financing Commitment Letter and Approve Subscription Procedures for First Lien Exit Facility.[24]

157.    **Relief Requested.**  The Debtors seek entry of an order (i) authorizing the Debtors to (a)  assume the Commitment Letter pursuant to Bankruptcy Code section 365(a); (b) pay the Put Option Premium, the Commitment Expenses and the Agent Fees, pursuant to the terms and conditions of the Commitment Letter, and (c) provide the Indemnification of the Indemnified Parties, pursuant to the terms and conditions of the Commitment Letter, all as provided for more fully in the Commitment Letter; and (ii) (a) approving the Subscription Procedures for the Subscription Process for Other Pre-Petition Noteholders to participate in the proposed First Lien Exit Facility and (b) authorizing the Debtors to conduct the Subscription Process in accordance with the Subscription Procedures.

158.    **Assumption of the Commitment Letter and Payment of Fees and Expenses.** On July 13, 2015, as contemplated by the Restructuring Support Agreement, HERO entered into the Commitment Letter with the Commitment Parties.   In the Commitment Letter, the Commitment Parties agreed to backstop the entire $450,000,000 of the First Lien Exit Facility, subject to implementation of the Subscription Process.  Following emergence, HERO plans to utilize the proceeds of the First Lien Exit Facility (a) to finance the remaining installment payment on the *Hercules Highlander* in the aggregate approximate amount of $200 million and related expenses, costs and charges related to the construction and purchase of the *Hercules*

---

[24] On or shortly after the Petition Date, the Debtors intend to file, and will seek expedited consideration of, the *Motion Of Hercules Offshore, Inc., et al., For An Order (I) Authorizing (A) Assumption Of Exit Financing Commitment Letter, (B) Payment Of Related Fees And Expenses, And (C) Indemnification Of Commitment Parties And (II) (A) Approving Subscription Procedures For Other Pre-Petition Noteholders To Participate In The Proposed First Lien Exit Facility And (B) Authorizing The Subscription Process With Respect To The Other Pre-Petition Noteholders.*

*Highlander* and (b) to provide Hercules with working capital to finance payments under the Plan and for its post-emergence operations and for other general corporate purposes. Commitment Letter, Ex. A at 2. The First Lien Exit Facility will mature on the date which is $4^1/_2$ years after the Closing Date and will be secured by first lien priority liens on substantially all of the assets of the Debtors and the Non-Debtor Subsidiaries that guarantee the indebtedness under the First Lien Exit Facility. The Debtors agreed to the terms of the First Lien Exit Facility after consulting with their advisors on the possibility of an out-of-court financing and after reaching a determination that the amount and pricing of the First Lien Exit Facility represented a reasonable exercise of the Debtors' business judgment.

159. <u>Put Option Premium</u>. In consideration for the agreement to provide the Commitment, HERO has agreed to pay the Commitment Parties a put option premium equal to 2.00% of the principal amount of the First Lien Exit Facility (the "<u>Put Option Premium</u>"). Commitment Letter § 3, Ex. A. at 3. A portion of the Put Option Premium equal to 1.00% of the amount of the First Lien Exit Facility (the "<u>Initial Put Option Premium</u>") was paid to the Commitment Parties upon execution of the Commitment Letter.[25] *Id.* The remaining portion of the Put Option Premium (the "<u>Remaining Put Option Premium</u>") is payable upon consummation of the Plan. *Id.* Additionally, in the event of and upon the Debtors' execution of an alternative financing transaction without the prior written consent of the Commitment Parties required under the Commitment Letter (an "<u>Alternative Transaction</u>"), HERO has agreed to pay the Remaining Put Option Premium to the Commitment Parties. Commitment Letter § 8. In light of the amount of the First Lien Exit Facility and the percentage of the Put Option Premium of the amount thereof, the Debtors believe the Put Option Premium is well within the range of similar

---

[25] The Debtors are not seeking authority from this Court to make that portion of the Put Option Premium that has already been paid.

premiums or commitment fees, if not lower than such range.  The Put Option Premium was a necessary condition for the Commitment Parties to enter into the Commitment Letter.  Absent the Put Option Premium, the Debtors would have been unlikely to obtain the financing commitments required for successful consummation of the Plan.

160.    _Expenses_.  HERO has also agreed to pay (i) all out-of-pocket expenses of the Commitment Parties in connection with the First Lien Exit Facility and the transactions contemplated thereby and for enforcement costs and documentary taxes associated with the Commitment Letter or the First Lien Exit Facility and the transactions contemplated thereby (including, but not limited to, the reasonable fees, disbursements and other charges of Akin Gump Strauss Hauer & Feld LLP, as lead counsel, and Blackstone Advisory Partners, L.P., as financial advisor, and of any special and local counsel reasonably necessary) (the "Commitment Party Expenses") and (ii) all reasonable out-of-pocket expenses of any administrative agent and/or collateral agent for the First Lien Exit Facility (the "Agent") in connection with the First Lien Exit Facility and the transactions contemplated thereby and for enforcement costs and documentary taxes associated with the Commitment Letter or the First Lien Exit Facility and the transactions contemplated thereby (including, but not limited to, the reasonable fees, disbursements and other charges of one law firm and any special and local counsel reasonably necessary) (the "Agent Expenses" and, together with the Commitment Party Expenses, the "Commitment Expenses").  Commitment Letter §5.  The Commitment Expenses are payable by HERO regardless of whether the First Lien Exit Facility is consummated.  _Id_.  Payment of the Commitment Expenses is a condition the Commitment Parties' commitments and agreements under the Commitment Letter.  Commitment Letter § 4.  The Commitment Expenses, specifically, will compensate the Commitment Parties for their actual costs incurred in

connection with their obligations under the Commitment Letter and participating in the negotiation of the Plan and the Commitment Letter.  The Commitment Expenses were the result of arm's length negotiations between the Debtors and the Commitment Parties and are reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11.

161.  <u>Agent Fees</u>.  HERO has also agreed to pay an arranger and administrative fee to the Agent in connection with the First Lien Exit Facility (the "<u>Agent Fees</u>").  Commitment Letter § 5.  The Agent Fees will compensate the Agent for certain services, including (i) negotiating the credit agreement on behalf of the Agent, (ii) working with the Debtors and the Other Pre-Petition Noteholders as part of the Subscription Procedures, and (iii) working with any Pre-Petition Noteholders by way of participation, assignment and fronting (as applicable) for such Pre-Petition Noteholders that cannot be signatories to the First Lien Exit Facility.  In addition, the Agent Fees will compensate the Agent for its post-closing administration of the First Lien Exit Facility.  The agreement of the Debtors to pay the Agent Fees is a condition to the Commitment Parties' commitments and agreements under the Commitment Letter.  Commitment Letter § 4. The Debtors will provide additional details with respect to the Agent Fees prior to any hearing on their approval.

162.  <u>Indemnities</u>.  As set forth more fully in the Commitment Letter, the Debtors have also agreed to indemnify, hold harmless and defend (the "<u>Indemnification</u>") the Commitment Parties, the Agent and each of their respective affiliates and their respective directors, officers, employees, attorneys, advisors, agents and other representatives (each an "<u>Indemnified Person</u>") from and against any losses, claims, damages and liabilities arising out of or in connection with (i) the Commitment Letter, (ii) the First Lien Exit Facility, or (iii) the transactions contemplated

by the Commitment Letter or the First Lien Exit Facility.  Commitment Letter § 5.    The Indemnification does not apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from (a) the willful misconduct or gross negligence of such Indemnified Person or (b) the material breach by such Indemnified Person of its obligations under this Commitment Letter or any of the First Lien Exit Facility documents.  *Id.*  The Indemnification was the result of arm's length negotiations between the Debtors and the Commitment Parties and is reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11.

163.    **Approval of Subscription Procedures.**  Pursuant to the Commitment Letter, the Restructuring Support Agreement, and the Plan, the Commitment Parties and the Debtors have agreed to provide Other Pre-Petition Noteholders (meaning holders of Pre-Petition Notes that are not Commitment Parties and meet certain eligibility requirements) with the opportunity to participate, on a pro rata basis, in the First Lien Exit Facility during the period from the Petition Date through the date of the hearing on confirmation of the Plan pursuant to procedures acceptable to the Required Commitment Parties subject to certain limitations.  Accordingly, to fulfill their obligations under the Commitment Letter, the Restructuring Support Agreement and the Plan, the Debtors have arranged to provide Other Pre-Petition Noteholders with the opportunity to subscribe for their pro rata portion of the First Lien Exit Facility pursuant to the Subscription Procedures.

164.    The Debtors believe that the Notice that will be distributed in connection with the Subscription Process, when taken together with the Plan, the Disclosure Statement and the Debtors' public filings, will provide Other Pre-Petition Noteholders with adequate information for all purposes relating to the Subscription Process, including for purposes of making an

informed decision as to such Other Pre-Petition Noteholders' participation in the First Lien Exit Facility. The Subscription Procedures and the Notice are designed to afford all interested Other Pre-Petition Noteholders entitled to participate in the First Lien Exit Facility a fair and reasonable opportunity to participate in the Subscription Process, and to inform such Other Pre-Petition Noteholders as to the appropriate procedures for such participation. The Debtors submit that Subscription Procedures and the Notice are reasonable and comparable to procedures and forms that have been approved in similar contexts. Additionally, approving the Debtors' use of Prime Clerk as Information Agent, therefore, will save the Debtors' estates resources and promote efficiency. Prime Clerk has experience serving as information agent and/or solicitation agent in other complex chapter 11 cases and is already serving as the Debtors' voting and claims agent.

165.    In view of the short timeline that may be interposed between the commencement of these chapter 11 cases and confirmation of the Plan, the Debtors seek to commence the Subscription Process as soon as reasonably practicable to ensure that the First Lien Exit Facility can be closed in a timely manner. As explained in more detail below, the Debtors intend to provide Other Pre-Petition Noteholders a period of 20 days from the commencement of the Subscription Process to review the subscription materials and determine whether to participate in the First Lien Exit Facility. The First Lien Exit Facility is a critical element of the Plan, and the financing commitment under the Commitment Letter expires if the First Lien Exit Facility does not close on or prior to November 7, 2015. The Debtors and the Non-Debtor Subsidiaries have operations in a significant number of countries and, therefore, closing of the First Lien Exit Facility could become extremely time-consuming. Accordingly, the Debtors believe that it is in the best interests of their estates to commence the Subscription Process as soon as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 13, 2015

Respectfully submitted,

_____
Troy L. Carson
Senior Vice President and Chief Financial Officer
Hercules Offshore, Inc., *et al.*