EXECUTION COPY

July 13, 2015

Hercules Offshore, Inc.
9 Greenway Plaza, Suite 2200
Houston, Texas 77046
Attention: Troy L. Carson

$450,000,000 First Lien Exit Credit Facility
Commitment Letter

Ladies and Gentlemen:

Hercules Offshore, Inc. ("<u>you</u>" or the "<u>Company</u>") and certain of its U.S. subsidiaries (the "<u>Debtor Subsidiaries</u>", and together with Company, the "<u>Debtors</u>") entered into that certain Restructuring Support Agreement, dated as of June 17, 2015 (including the term sheet attached thereto (the "<u>RSA Term Sheet</u>") and the other attachments thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "<u>RSA</u>"), by and among the Debtors and the supporting noteholders from time to time party thereto. In connection with the foregoing, you have requested that the parties listed on <u>Schedule I</u> hereto ("<u>us</u>", "<u>we</u>" or the "<u>Commitment Parties</u>"), agree to backstop a first lien senior secured term loan facility (the "<u>First Lien Exit Facility</u>") in an aggregate principal amount of $450,000,000. Capitalized terms used but not defined herein are used with the meanings assigned to them on the <u>Exhibit A</u> attached hereto (the "<u>Term Sheet</u>").

    1. <u>Commitment</u>

In connection with the foregoing, the Commitment Parties are pleased to advise you of their commitment to backstop the First Lien Exit Facility, on a several and not joint basis, in the amounts set forth opposite each such Commitment Party's name on <u>Schedule I</u> hereto (the "<u>Commitments</u>") upon the terms and subject to the conditions set forth or referred to in this Commitment Letter and the Term Sheet (this Commitment Letter, including the Term Sheet and the other attachments hereto, will be referenced herein as the "<u>Commitment Letter</u>").

The rights and obligations of each of the Commitment Parties under this Commitment Letter shall be several and not joint, and no failure of any Commitment Party to comply with any of its obligations hereunder shall prejudice the rights of any other Commitment Party; *provided* that no Commitment Party shall be required to fund the commitment of another Commitment Party in the event such other Commitment Party fails to do so (the "<u>Breaching Party</u>"), but may at its option do so, in whole or in part, in which case such performing Commitment Party shall be entitled to all or a proportionate share, as the case may be, of the First Lien Exit Facility and related fees and put option premiums that would otherwise be issued to the Breaching Party.

A portion of the Commitment Parties' Commitments hereunder shall be reduced, ratably

based on the initial Commitments, in an aggregate amount equal to any commitment under the First Lien Exit Facility allocated to holders pursuant to the Subscription Procedures (as defined below) (other than the Commitment Parties) (the "Other Pre-Petition Noteholders") of the Company's 7.375% Senior Notes due March 1, 2018 (the "Legacy Notes"), 10.250% Senior Notes due April 1, 2019 ("April 2019 Notes"), 8.75% Senior Notes due July 15, 2021 (the "July 2021 Notes"), 7.50% Senior Notes due October 1, 2021 (the "October 2021 Notes"), 6.75% Senior Notes due April 1, 2022 (the "April 2022 Notes") and 3.375% Convertible Senior Notes due 2038 (the "Convertible Notes" and, together with the Legacy Notes, April 2019 Notes, July 2021 Notes, October 2021 Notes and April 2022 Notes, the "Pre-Petition Notes")).

2.  Information

You hereby represent and covenant that (a) all written information, other than the Projections (as defined below) and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or on behalf of you by any of your representatives is or will be, when taken as a whole, complete and correct in all material respects and does not or will not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or on behalf of you by any of your representatives have been or will be prepared in good faith based upon assumptions that you believe are reasonable at the time made and at the time the related Projections are made available to us.  You agree that if, at any time prior to the execution of the First Lien Exit Facility, you become aware that any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances; *provided* that any such supplemental Information and Projections shall be treated as confidential in accordance with this Commitment Letter.

In providing this Commitment Letter and arranging the First Lien Exit Facility, the Commitment Parties are relying on the accuracy of the Information furnished to them by or on behalf of you by your representatives without independent verification thereof.

3.  Fees and Put Option Premiums

As a condition for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees and put option premiums described herein and in the Term Sheet on the terms and subject to the conditions set forth therein.

4.  Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this Section 4.

110356575 v13

Each Commitment Party's commitments and agreements hereunder are further subject to (a) the Required Commitment Parties' reasonable satisfaction with the approval by the Bankruptcy Court (as defined in the RSA) of (i) the First Lien Exit Facility and all definitive documentation in connection therewith consistent with the Term Sheet and in form and substance satisfactory to each of the Commitment Parties and (ii) all actions to be taken, undertakings to be made and obligations to be incurred by the Debtors in connection with the First Lien Exit Facility and all liens and other security to be granted by the Debtors in connection with the First Lien Exit Facility (all such approvals to be evidenced by the entry of an order by the Bankruptcy Court which is in full force and effect and has not been stayed or modified and is satisfactory in form and substance to the Required Commitment Parties in their reasonable discretion, which order shall, among other things, approve the payment by the Debtors of all of the fees and put option premiums that are provided for in, and the other terms of, this Commitment Letter); (b) since June 17, 2015, there has not been (i) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other fact, event, change, effect, development, circumstance or occurrence, has had or could reasonably be expected to have a material and adverse effect on the condition (financial or otherwise), business, assets, liabilities or results of operations of the Company and its subsidiaries taken as a whole, (ii) anything that could reasonably be expected to prevent, materially delay or materially restrict or impair the Company and its subsidiaries party to the RSA from consummating the transactions contemplated in the RSA Term Sheet, the Plan (as defined in the RSA) and the RSA, or (iii) any fact, event, change, effect, development, circumstance or occurrence that, individually or together with any other  fact, event, change, effect, development, circumstance or occurrence that, has had or could reasonably be expected to have a material and adverse effect on (A) the ability of the Company or the other Loan Parties (as defined in the Term Sheet) to perform their respective obligations under the loan agreement, guarantees and security documents relating to the First Lien Exit Facility or any other First Lien Loan Documents (as defined in the Term Sheet) or (B) the ability of the Agent (as defined below) and/or the Lenders (as defined in the Term Sheet) to enforce their rights and remedies under the First Lien Loan Documents (in each case, "Material Adverse Change"); *provided* that the following shall not constitute a Material Adverse Change and shall not be taken into account in determining whether or not there has been, or could reasonably be expected to be a Material Adverse Change under clauses (i), (ii) and (iii) above: (A) any change after June 17, 2015 in any law or GAAP, or any interpretation thereof; (B) any change after June 17, 2015 in currency, exchange or interest rates or the financial or securities markets generally; (C) any change to the extent resulting from the announcement or pendency of the transactions contemplated by the RSA or the RSA Term Sheet; and (D) any change resulting from actions of the Company expressly required to be taken pursuant to the RSA or the RSA Term Sheet, except in the cases of clauses (A) and (B) above to the extent such change or event is disproportionately adverse with respect to the Company when compared to other companies in the industry in which the Company operates; *provided, further*, for the avoidance of doubt and notwithstanding the above, it shall be a Material Adverse Change if there occurs any of the following: (x) any adverse development with respect to the contract with Maersk Oil UK Limited with respect to the *Hercules Highlander* (the "Highlander Contract"); (y) any adverse development with respect to any other material contract (or contracts), including (1) the contract with a subsidiary of Eni S.p.A. with respect to the Hercules 260 (the "Hercules 260 Contract") and (2) the contracts with

110356575 v13

Saudi Aramco with respect to the Hercules 261 and Hercules 262 (the "Hercules 261/262 Contract"), that could, individually or in the aggregate, reasonably be expected to result in a reduction in revenue backlog of more than $90 million for the Company; *provided* that any such reduction in revenue backlog attributable to a contract with a customer shall be netted against any additional revenue attributable to extension, amendment or renegotiation of an existing contract or execution of a new contract with such customer and/or any of such customer's affiliates within three (3) days of the occurrence of the reduction, or (z) the termination, replacement, resignation, or other change in the identity, of the CEO of the Company (for the avoidance of doubt, the preceding clause (y) assumes that no Material Adverse Change has occurred as a result of the announced modifications to the Saudi Aramco contracts publicly disclosed on June 1, 2015); (c) your compliance in all material respects with your obligation to supplement Information and Projections as set forth in Section 2 hereof; (d) your compliance in all material respects with the terms of this Commitment Letter; (e) execution and delivery of definitive documentation evidencing the First Lien Exit Facility, which shall be substantially consistent with the Term Sheet and otherwise reasonably satisfactory to the Required Commitment Parties, (f) the Other Pre-Petition Noteholders shall have been provided the opportunity to subscribe for a portion of the Commitments under the First Lien Exit Facility pursuant to procedures acceptable to the Required Commitment Parties ("Subscription Procedures") (it being understood that the Commitments hereunder are not conditioned upon any Other Pre-Petition Noteholder's actual subscription for any of the commitments under the First Lien Exit Facility); (g) the transactions contemplated by this Commitment Letter and the Term Sheet shall have been consummated in accordance with applicable laws, rules and regulations in a manner reasonably acceptable to the Required Commitment Parties and the Company; (h) all fees and reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, legal and financial advisory fees and expenses) and other compensation payable to the Agent and the Commitment Parties pursuant to this Commitment Letter or otherwise payable pursuant to the other First Lien Loan Documents or RSA shall have been paid to the extent due; (i) the Agent shall have received (u) customary legal opinion(s) with respect to the Loan Parties and the First Lien Loan Documents from counsel of the Loan Parties (or counsel to the Agent, to the extent customary in non-U.S. jurisdictions) in form and substance reasonably satisfactory to the Required Commitment Parties, (v) evidence of authorization of the Loan Parties to execute, deliver and perform their respective obligations under the First Lien Loan Documents, (w) customary officer's and secretary's certificates, (x) customary corporate documents, (y) good standing certificates (to the extent applicable) and (z) a solvency certificate from the Company's chief financial officer or treasurer in form and substance reasonably satisfactory to the Required Commitment Parties; (j) all documents and instruments required to create and perfect the Agent's security interest in the Collateral (as defined in the Term Sheet) (free and clear of all liens, subject to customary and limited exceptions to be agreed upon) shall have been executed (if applicable) and delivered and, if applicable, be in proper form for filing and execution of guarantees in form and substance reasonably satisfactory to the Required Commitment Parties by the Guarantors (as defined in the Term Sheet), which shall be in full force and effect, (k) absence of defaults or events of default under the First Lien Loan Documents; (l) accuracy of representations and warranties in all material respects; (m) each Commitment Party having received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations; (n) receipt of public ratings for the First Lien Exit

Facility from each of Standard & Poor's Rating Service ("S&P") and Moody's Investors Service, Inc. ("Moody's"); (o) the Plan shall be in form and substance materially consistent with the terms set forth in the RSA and otherwise reasonably satisfactory to the Required Commitment Parties (the "Approved Plan"); (p) the confirmation order for the Approved Plan shall be entered in form and substance reasonably satisfactory to the Required Commitment Parties; (q) the effective date of the Approved Plan shall have occurred; (r) the RSA shall be in full force and effect and the Debtors shall be in compliance with the RSA in all material respects as of the Closing Date (as defined in the Term Sheet), and the Company and each of the other Loan Parties party to the RSA shall have satisfied each of the conditions to the Restructuring (as defined in the RSA) as set forth in the RSA; and (s) execution and delivery of the Escrow Agreement and any related documents, in each case, in form and substance reasonably satisfactory to the Required Commitment Parties.

As used herein, "Required Commitment Parties" means the Commitment Parties holding more than 66 2/3% of the outstanding Commitments of all Commitment Parties.

5.  Indemnification and Expenses

You agree to indemnify, hold harmless and defend the Commitment Parties, any administrative agent and collateral agent for the First Lien Exit Facility (in any such capacity, the "Agent"), their respective affiliates and their respective directors, officers, employees, attorneys, advisors, agents and other representatives (each, an "Indemnified Person") from and against any and all losses, claims, damages and liabilities to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the First Lien Exit Facility, the transactions contemplated by the Commitment Letter or the First Lien Exit Facility, the use of the proceeds thereof or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from (a) the willful misconduct or gross negligence of such Indemnified Person or (b) the material breach by such Indemnified Person of its obligations under this Commitment Letter or any of the First Lien Loan Documents.  In the case of a Proceeding to which the indemnity in this paragraph applies, such indemnity will be effective whether or not such claim, investigation, litigation or proceeding is brought by the Company, any of its directors, equity holders, security holders, affiliates or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of one law firm acting as counsel (and any local counsel reasonably necessary in all relevant jurisdictions and special counsel reasonably necessary) and one financial advisory firm of the Commitment Parties and one law firm acting

as counsel (and any special or local counsel reasonably necessary) for the Agent and an arranger and administrative fee with respect to the First Lien Exit Facility payable to the Agent in an amount to be determined by the Commitment Parties and the Company) in connection with the First Lien Exit Facility and the transactions contemplated thereby shall be paid by the Company and (b) all out-of-pocket expenses (including, without limitation, documented fees, disbursements and other charges of one law firm acting as counsel (and any local counsel reasonably necessary in all relevant jurisdictions and special counsel reasonably necessary) and one financial advisory firm of the Commitment Parties and one law firm acting as counsel (and any special or local counsels reasonably necessary) for the Agent) for the enforcement costs and documentary taxes associated with this Commitment Letter or the First Lien Exit Facility and the transactions contemplated hereby or thereby shall be paid by the Company, in each case for clauses (a) and (b) regardless of whether the Closing Date occurs; *provided that*, the lead counsel and financial advisor of the Commitment Parties selected pursuant to clauses (a) and (b) above shall be Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") and Blackstone Advisory Partners L.P. ("***Blackstone***"), respectively.

It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the First Lien Exit Facility on a several, and not joint, basis with any other Commitment Party. No Indemnified Party will have any liability (whether in contract, tort or otherwise) to the Company or any of its affiliates or any of their respective security holders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a final, nonappealable judgment of a court of competent jurisdiction to arise from (a) the gross negligence or willful misconduct of such Indemnified Person or (b) the material breach by such Commitment Party of its obligations under this Commitment Letter or any of the First Lien Loan Documents.  No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of, such Indemnified Person.  None of the Indemnified Persons nor any Loan Party shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the First Lien Exit Facility or the transactions contemplated hereby or thereby.

### 6.  Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of, or claims against, you, your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.  You acknowledge for United States securities law purposes that any Commitment Party may establish an information blocking device or "Information Barrier" between, on the one hand, its directors, officers, employees, agents, affiliates (as such term is used in Rule 12b-2 under the

Exchange Act) and, on the other hand, its affiliates and its and their attorneys, accountants, financial or other advisors, members, equityholders, partners, directors and employees who, pursuant to such Information Barrier policy, are permitted to receive confidential information or otherwise participate in discussions concerning the transactions contemplated hereby, and those of such Commitment Party's, and its affiliates', other employees.  You acknowledge the potential existence of any Commitment Party's Information Barrier but do not warrant or guarantee any Commitment Party's compliance with United States securities law or that the Information Barrier will operate in accordance with its intended purpose.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation or duty (including any implied duty) to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

Additionally, you acknowledge and agree that none of the Commitment Parties are advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated by this Commitment Letter, and the Commitment Parties shall not have any responsibility or liability to you with respect thereto.  Any review by the Commitment Parties of the transactions contemplated by this Commitment Letter or other matters relating thereto will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of you or any of your affiliates.

7.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to your and your subsidiaries' respective officers, directors, attorneys, accountants, agents and advisors, in each case on a confidential and need-

110356575 v13

to-know basis, (b) to the extent required in any legal, judicial or administrative proceeding or as otherwise required by law or regulation (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof), (c) in the Approved Plan, in the Disclosure Statement (as defined in the RSA) or in a Bankruptcy Court filing in order to implement the transactions contemplated hereunder (*provided*, that at the request of the Commitment Parties, certain parts shall be redacted and not filed publicly) , (d) upon notice to the Commitment Parties, in connection with any public filing requirement you are legally obligated to satisfy and agreed to by the Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), and (e) with respect to the Term Sheet only, to S&P and Moody's, on a confidential basis, in connection with obtaining ratings for the First Lien Exit Facility.

Each of the Commitment Parties shall use all nonpublic information provided to them by you or on behalf of you by any of your representatives hereunder solely in connection with the First Lien Exit Facility or the Restructuring and shall treat confidentially all such information; *provided* that nothing herein shall prevent any Commitment Party from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case such Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent timely practicable and not prohibited by law, rule, regulation or other legal process), (ii) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or its Representatives (as defined below) in breach of this Commitment Letter, (iv) to any Commitment Party's affiliates, and its and such affiliates' respective employees, directors, officers, legal counsel, independent auditors, professionals and other experts, advisors or agents (collectively, "*Representatives*") who need to know such information in connection with the transactions contemplated by the Commitment Letter and are informed of the confidential nature of such information and instructed to keep such information of this type confidential, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by such Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you, (vii) to the extent that such information is independently developed by such Commitment Party or (viii) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to the Company or any of their its subsidiaries or any of their respective obligations, in each case, who agree to be bound by confidentiality and use restrictions. The provisions of this paragraph shall automatically terminate and be superseded by the confidentiality provisions to the extent covered in the definitive documentation for the First Lien Exit Facility upon the initial funding thereunder and shall in any event automatically terminate one year following the date of this Commitment Letter. Notwithstanding any other provision herein, this Commitment Letter does not limit the disclosure of any tax strategies.

8. Exclusivity

You agree that, from the date hereof until the earliest of the Closing Date or the termination of this Commitment Letter, you will not and you will not permit any of your affiliates to, syndicate or issue, attempt to syndicate or issue, announce or authorize the

8

announcement of syndication or issuance of, or engage in discussions concerning the syndication or issuance of, any debt securities or commercial bank or other credit facilities (other than the First Lien Exit Facility) (an "Alternate Financing") without the prior written consent of the Required Commitment Parties. You further agree that promptly upon your receipt of any written alternative proposal for Alternate Financing received by the Debtors after the date hereof, you will provide to Akin Gump and Blackstone a copy of any such alternative proposal. You also agree that if you or any of your affiliates enter into any Alternate Financing, the terms and conditions (and the documentation with regard thereto) of such Alternate Financing shall be in all respects in form and substance satisfactory to the Commitment Parties. If you enter into an Alternate Financing without the consent of the Required Commitment Parties, without limiting any other rights and remedies of the Commitment Parties under this Commitment Letter or applicable law, you agree to pay to each Commitment Party, the remaining put option premium of 1.00% of the principal amount of the First Lien Exit Facility, ratably based on their commitments to fund the First Lien Exit Facility, that would have been payable upon consummation of the Approved Plan as described in the Term Sheet at the time a commitment is executed in connection with the Alternate Financing.

    9.   Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons to the extent expressly set forth herein. Assignments by any Commitment Party shall be subject to Section 1 hereof. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby, and to satisfy its obligations hereunder through, or assign its rights and obligations hereunder to, one or more of its affiliates, separate accounts within its control or investments funds under its or its affiliates' management (collectively, "Commitment Party Affiliates"); and to allocate, in whole or in part, to their affiliates certain fees and put options premiums payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion; *provided* that, no delegation or assignment to a Commitment Party Affiliate shall relieve such Commitment Party from its obligations hereunder to the extent that any Commitment Party Affiliate fails to satisfy the Commitments hereunder at the time required.

This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter (and the agreements referenced in this Commitment Letter) set forth the entire understanding of the parties with respect to the First Lien Exit Facility, and replace and supersede all prior agreements and understandings (written or oral) related to the subject matter hereof. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the

laws of the State of New York and the Bankruptcy Code, to the extent applicable.

Prior to the Petition Date (as defined in the RSA), you and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder.  On or after the Petition Date, you and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court (as defined in the RSA) and any other Federal court, and any appellate court from any thereof, having jurisdiction over the Chapter 11 Cases (as defined in the RSA) from time to time, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder.  You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Commitment Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Debtors and the other Loan Parties, which information includes names, addresses, tax identification numbers and other information that will allow such Commitment Party or Lender to identify the Debtors and the other Loan Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, expense reimbursement, jurisdiction, confidentiality, governing law, sharing of information, no agency or fiduciary duty, waiver of jury trial, service of process and venue provisions contained herein shall remain in full force and effect regardless of whether the First Lien Loan Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the Commitments; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded by the provisions of the First Lien Loan Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent any of the First Lien Loan Documents has comparable provisions with comparable coverage.

You and we hereto agree that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter herein; it being acknowledged and agreed that the funding of the First Lien Exit Facility is subject to the conditions specified herein, including the execution and delivery of the First Lien Loan Documents by the parties hereto in a manner

consistent with this Commitment Letter. Each of the Commitment Parties and you will use their commercially reasonable efforts to prepare, negotiate and finalize the First Lien Loan Documents as contemplated by the Term Sheet.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter no later than 11:59 p.m., New York City time, on July 13, 2015. This offer will automatically expire if we have not received such executed counterparts in accordance with the preceding sentence. In addition, the commitment and agreements of the Commitment Parties hereunder shall expire (i) at 5:00 p.m. (New York City time) on November 7, 2015 (the "Termination Date") unless, prior to that time, the Closing Date shall have occurred and the Debtors shall have paid to the Commitment Parties and the Agent the fees and put option premiums that are specified in this Commitment Letter and the Term Sheet to be due on or prior to the Closing Date; (ii) upon the termination of the RSA or (iii) if a copy of the order entered by the Bankruptcy Court approving your obligations under this Commitment Letter, including, without limitation, the fees and put option premiums set forth in this Commitment Letter and Term Sheet, which order shall be in form and substance reasonably satisfactory to the Required Commitment Parties (and which order shall be in full force and effect and shall not be stayed or modified) is not delivered to Akin Gump and Blackstone within twenty-one (21) days after the Petition Date, unless waived or otherwise extended by the Required Commitment Parties.

*[Remainder of this page intentionally left blank]*

110356575 v13

Very truly yours,

**BLACKWELL PARTNERS, LLC  - SERIES A**
By: Bowery Investment Management, LLC, its Manager

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


**BOWERY OPPORTUNITY FUND, L.P.**
By: Bowery Opportunity Management, LLC, its General
Partner

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


**BOWERY OPPORTUNITY FUND, Ltd.**

By: _____
Name: Vladimir Jelisavcic
Title:  Director


**P BOWERY, LTD**
By: Bowery Investment Management, LLC, its
Investment Adviser

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


[Signature Page to Commitment Letter]

Very truly yours,

**CVI CVF II LUX SECURITIES TRADING S.A R.L.**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

**CVIC LUX SECURITIES TRADING S.A R.L**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

**CVIC II LUX SECURITIES TRADING S.A R.L.**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

**CVI AA LUX SECURITIES S.A R.L.**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

**CVI CHVF LUX SECURITIES S.A R.L.**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

**CARVAL GCF LUX SECURITIES S.A.R.L.**

By: _____

Name:    DAVID CHENE
Title:     MANAGING DIRECTOR

[Signature Page to Commitment Letter]

Very truly yours,

**CREDIT SUISSE SECURITIES (USA) LLC**

By: _____

Name: Christopher S. Campbell

Title: Director

Very truly yours,

**FRANKLIN ADVISERS, INC., AS INVESTMENT
MANAGER ON BEHALF OF CERTAIN FUNDS
AND ACCOUNTS**

By: _____

Name:    Edward Perks

Title:    EVP

[Signature Page to Commitment Letter]

Very truly yours,

**NOMURA CORPORATE RESEARCH & ASSET MANAGEMENT INC., AS INVESTMENT ADVISOR, ON BEHALF OF CERTAIN FUNDS AND MANAGED ACCOUNTS**

By: _____
Name: Steven Rosenthal
Title: Executive Director

Very truly yours,

**QUANTUM PARTNERS LP**

By: QP GP LLC, its General Partner

By: _____
Name:
Title:            THOMAS L. O'GRADY
                  Attorney-in-Fact

Very truly yours,

**Each of the entities listed on Schedule 1, severally and not jointly**

**By: T. ROWE PRICE ASSOCIATES, INC.**

As investment adviser to the funds and accounts set forth in Schedule 1

By: _____

Name: Rodney M. Rayburn

Title: Vice President

Very truly yours,

**Third Avenue Trust, on behalf of Third Avenue Focused Credit Fund**

By: _____
Name: Vincent J. Dugan
Title:  Chief Financial Officer

Very truly yours,

**WESTERN ASSET MANAGEMENT
COMPANY, AS INVESTMENT MANAGER
AND AGENT ON BEHALF OF CERTAIN OF
ITS CLIENTS**

By: _____

Name: C. A. Ruys de Perez

Title: Secretary

**T. Rowe Price Associates, Inc.**
**Schedule 1**

**FUND/ACCOUNT LEGAL NAME**


T. ROWE PRICE CREDIT OPPORTUNITIES FUND, INC.
T. ROWE PRICE FIXED INCOME TRUST
T. ROWE PRICE FUNDS SERIES II SICAV- CREDIT OPPORTUNITIES FUND
T. ROWE PRICE HIGH YIELD FUND, INC.
T. ROWE PRICE HIGH YIELD MULTI-SECTOR ACCOUNT PORTFOLIO
T. ROWE PRICE INSTITUTIONAL CREDIT OPPORTUNITIES FUND
T. ROWE PRICE INSTITUTIONAL HIGH YIELD FUND
T. ROWE PRICE U.S. HIGH YIELD TRUST
THE NEW AMERICA HIGH INCOME FUND, INC.
JOHN HANCOCK FUNDS II – SPECTRUM INCOME FUND
PENN SERIES FUNDS, INC. – PENN SERIES HIGH YIELD BOND FUND

Agreed to and Accepted this
___12__ day of ___July___, 2015

HERCULES OFFSHORE, INC.


By: _____
Name: TROY CARSON
Title: SVP/CFO

## Schedule I

Commitment Parties

**REDACTED**

**EXHIBIT A**

**HERCULES OFFSHORE, INC.**
**$450.0 Million First Lien Exit Facility**
**Summary of Principal Terms and Conditions[1]**

*Borrower:*   Hercules Offshore, Inc., a Delaware corporation (the "<u>Company</u>" or the "<u>Borrower</u>").

*Guarantors:*   The obligations under the First Lien Exit Facility shall be unconditionally guaranteed, on a joint and several basis, by each of the Debtors (other than the Company) and substantially all of the Company's existing direct and indirect domestic and foreign subsidiaries and any future direct and indirect wholly-owned subsidiaries of the Company (collectively, the "<u>Guarantors</u>"), subject to limitations under applicable law and exceptions satisfactory to the Commitment Parties, including with respect to immaterial subsidiaries with de minimis assets and revenue (subject to thresholds reasonably satisfactory to the Required Commitment Parties); *provided* that with respect to foreign subsidiaries formed or acquired after the Closing Date, such foreign subsidiaries will not be required to guarantee the obligations under the First Lien Exit Facility to the extent such guarantees would be prohibited by applicable law, are not within the legal capacity of the relevant subsidiary or would reasonably be expected to result in a breach of applicable fiduciary duties of the directors of the relevant subsidiary.[2]  The Borrower and the Guarantors are referred to herein as "<u>Loan Parties</u>" and each, a "<u>Loan Party</u>".

*Administrative Agent:*   A financial institution reasonably acceptable to the Borrower and the Commitment Parties (the "<u>Agent</u>").

*Lenders:*   To the extent permitted by applicable securities laws, the Borrower shall offer all holders of the Pre-Petition Notes the opportunity to participate in the First Lien Exit Facility on a ratable basis pursuant to

---

[1] Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter to which this term sheet is attached as Exhibit A.

[2] The Guarantors will not include Cliffs Drilling (Barbados) Holdings SRL; Cliffs Drilling (Barbados) SRL; Cliffs Drilling Trinidad Offshore Limited; Cliffs Drilling Trinidad, LLC; Hercules Offshore de Mexico, S. de RL de CV; and Hercules Discovery Ltd.; provided that (i) the aggregate revenue of such entities, as of the end of the most recent fiscal quarter for which financial statements are available prior to the Closing Date, is less than 1.0% of the consolidated revenue of the Company and its subsidiaries as of the end of such fiscal quarter and (ii) the aggregate assets of such entities, as of the end of the most recent fiscal quarter for which financial statements are available prior to the Closing Date, is less than or equal to 2.0% of the consolidated assets of the Company and its subsidiaries as of the end of such fiscal quarter.  Hercules Tanjung Asia Sdn. Bhd. will only be required to become a Guarantor upon receipt of required governmental approvals.

The Guarantors will include Hercules Offshore International, LLC, a Delaware limited liability company, which is not a Debtor because it did not guarantee the Pre-Petition Notes.  This entity owns the equity of Hercules Offshore (Nigeria) Limited that is not owned by a third party.

procedures satisfactory to the Required Commitment Parties.[3]  Any amounts of the First Lien Exit Facility not so allocated shall be allocated to the Commitment Parties on a ratable basis based on their respective Commitments.  The holders of the Pre-Petition Notes that participate in the First Lien Exit Facility, together with the Commitment Parties, are referred to herein as the "<u>Lenders</u>".

| | |
|---|---|
| *First Lien Exit Facility:* | A senior secured term loan facility in an aggregate principal amount of $450.0 million (the "<u>First Lien Exit Facility</u>" and the loans thereunder, the "<u>First Lien Loans</u>"), which will be available to be drawn in a single drawing on the Closing Date.  The proceeds of the First Lien Loans in an aggregate amount equal to $200.0 million (the "<u>Escrowed First Lien Loans</u>") shall be funded into the Escrow Account (as defined below) on the Closing Date, and such proceeds shall be paid out to the Borrower upon satisfaction of the conditions set forth under "Escrow Account" below.  The remaining amount of the First Lien Loans shall be funded directly to the Borrower on the Closing Date. |
| *Use of Proceeds:* | The proceeds of the First Lien Exit Facility will be used by the Borrower to (a) finance the remaining installment payment on the *Hercules Highlander* and related expenses, costs and charges related to the construction and purchase of the *Hercules Highlander*, (b) pay for any and all exit-related costs and any and all transaction fees and expenses, including payment on account of claims, as part of the Approved Plan, and (c) provide the Company and its subsidiaries with working capital for their post-emergence operations and for other general corporate purposes of the Company and its subsidiaries. |
| *Maturity:* | The First Lien Exit Facility will mature on the date that is 4.5 years after the Closing Date.  There will be no required amortization payments prior to the maturity date. |
| *Interest:* | The First Lien Exit Facility (including, for the avoidance of doubt, the Escrowed First Lien Loans) will bear interest at LIBOR plus 9.50% *per annum* with a LIBOR floor of 1.00%.  All interest will be payable quarterly in cash. |
| *Default Interest:* | During the continuance of an event of default (as defined in the First Lien Loan Documents (as defined below)), the First Lien Loans will bear interest at an additional 2.00% *per annum* and any other overdue amounts (including overdue interest) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.  Default interest shall be payable on demand. |

---

[3] Participation in the First Lien Exit Facility shall be made available to all holders (to the extent permitted by securities laws) of the Pre-Petition Notes during the time from the petition date of the Debtors through the hearing on confirmation of the Approved Plan (in a Pre-Packaged Case (as defined in the RSA)) or from the hearing on the Disclosure Statement (as defined in the RSA) through the hearing on confirmation of the Approved Plan (in a Pre-Negotiated Case (as defined in the RSA)).

| | |
|---|---|
| *OID:* | The First Lien Loans will be issued at a price equal to 97% of the principal amount of the First Lien Exit Facility. |
| *Put Option Premium:* | The Commitment Parties shall receive a put option premium equal to 2.00% of the principal amount of the First Lien Exit Facility, to be allocated ratably based on their commitments to fund the First Lien Exit Facility, with 1.00% of that put option premium payable upon execution of the Commitment Letter by all of the parties thereto and the remaining 1.00% payable upon consummation of the Plan. |
| *Collateral:* | The obligations under the First Lien Exit Facility shall be secured by first priority (subject only to permitted liens reasonably satisfactory to the Required Commitment Parties) pledges of all of the equity interests of each of the Company's and each Guarantor's direct subsidiaries, and perfected first priority (subject only to permitted liens reasonably satisfactory to the Required Commitment Parties) security interests in and mortgages on all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment (including, without limitation, the *Hercules Highlander* and other ships and rigs), general intangibles (including, without limitation, all contracts related to the *Hercules Highlander*) intercompany notes, insurance policies, investment property, intellectual property, cash, deposit and securities accounts and proceeds of the foregoing) of the Borrower and the Guarantors, wherever located, now or hereafter owned, subject to exceptions as reasonably satisfactory to the Required Commitment Parties (collectively, the "Collateral"); *provided* that the Collateral will not include (a) immaterial (as determined by the Required Commitment Parties) real property, (b) contractual rights to the extent the grant of a security interest or lien would violate the terms thereof after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibition, (c) assets with respect to which the creation and/or perfection of a security interest therein is prohibited by applicable law, and (d) other assets for which the cost of perfection of a security interest therein outweighs the benefit to the Commitment Parties thereof in the sole discretion of the Required Commitment Parties for such determinations prior to the Closing Date, and in the sole discretion of the Agent for such determinations made after the Closing Date. |
| | The Loan Parties shall be required to enter into (i) insurance assignments in form and substance reasonably satisfactory to the Required Commitment Parties covering all of such Loan Party's present and future interest in insurance in respect of vessels and other Collateral and (ii) earnings assignments in form and substance reasonably satisfactory to the Required Commitment Parties ("Earnings Assignments") covering all earnings or other moneys due to the Borrower or its subsidiaries in relation to any vessel owned or managed by the Borrower or its subsidiaries. All amounts collaterally |

assigned pursuant to any Earnings Assignment shall be paid directly to an account subject to a control agreement or similar arrangements under applicable law in favor of the Agent ("Earnings Accounts").

Borrower and the Guarantors shall be required to maintain control agreements or control, lockbox or similar arrangements under applicable law with respect to deposit and securities accounts, subject to exceptions reasonably satisfactory to the Required Commitment Parties.  For the avoidance of doubt, the Escrow Account and each Earnings Account shall be subject to a control agreement or similar arrangements under applicable law in favor of the Agent.

*Optional Prepayment:*       Permitted in whole or in part, with prior written notice at:

(a) 103% of par *plus* the present value at such prepayment date of all required interest payments due through the date that is the third anniversary of the Closing Date, all computed using a discount rate equal to the Treasury Rate plus 50 bps, on or prior to the third anniversary of the Closing Date;

(b) 103% of par after the third anniversary of the Closing Date and on or prior to the fourth anniversary of the Closing Date; and

(c) without premium or penalty after the fourth anniversary of the Closing Date;

(plus, in each case, LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments.

*Mandatory Prepayment:*      The First Lien Loans shall be prepaid in an amount equal to (a) 100% of the net cash proceeds received from the sale or other disposition of all or any part of the assets of  Company or any of its subsidiaries after the Closing Date, subject to exceptions and reinvestments rights to be agreed, (b) 100% of the net cash proceeds received by the Company or any of its subsidiaries from the issuance or incurrence of debt that is not permitted by the First Lien Loan Documents, (c) 100% of the net cash proceeds received from the issuance of capital stock by the Company, subject to exceptions to be agreed, including for equity used to finance the construction or acquisition of certain vessels or other permitted acquisitions to be agreed, (d) 100% of all casualty and condemnation proceeds (excluding amounts applied to replace or restore any properties) in respect of which such cash proceeds are paid to the Company and its subsidiaries, (e) 100% of all net cash proceeds in respect of (i) any termination fee received by the Company or its subsidiaries in connection with the contract, dated as of May 19, 2014, between Jurong Shipyard Pte Ltd ("Jurong") and Hercules North Sea, Ltd (the "Highlander Construction Contract") or (ii) any cancellation or termination fee received by the Company or its subsidiaries in connection with the termination of the Highlander Contract and (f) 100% of the funds in

4

the Escrow Account if the Borrower determines that the Escrow Conditions (as defined below) cannot be met and provides written notice of same to the Escrow Agent and the Agent. Mandatory prepayments described in clauses (a), (c), (d), (e) and (f) shall be made at par.

Upon the occurrence of a change of control (to be defined in a manner reasonably satisfactory to the Commitment Parties) in the Company, after the Closing Date, but prior to the maturity of the First Lien Exit Facility, the Lenders shall have the option to require the Company to repay the First Lien Exit Facility at a cash price equal to 101% of the outstanding principal amount of the First Lien Exit Facility.

| | |
|---|---|
| *Loan Documents:* | The First Lien Exit Facility will be documented by a Senior Secured Credit Agreement (the "First Lien Credit Agreement") and other guarantee, security, escrow account, insurance assignments, Earnings Assignments and other relevant documentation (together with the First Lien Credit Agreement, collectively, the "First Lien Loan Documents") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Agent and the Commitment Parties. |
| *Escrow Account:* | The Borrower and Agent shall enter into an escrow agreement in form and substance reasonably satisfactory to the Commitment Parties ("Escrow Agreement") with a financial institution reasonably acceptable to the Borrower and the Commitment Parties, as escrow agent (the "Escrow Agent").   In accordance with the Escrow Agreement, on the Closing Date, the Agent shall deposit the proceeds of the Escrowed First Lien Loans into a separate account, subject to a control agreement in favor of the Agent (the "Escrow Account") to be managed and paid out by the Escrow Agent to the Borrower, subject to conditions satisfactory to the Commitment Parties set forth in the First Lien Loan Documents, including, without limitation, the delivery of a certificate by an officer of the Company to the Agent certifying (i) the amount of the final installment payment and any adjustments to the final installment payment pursuant to the Highlander Construction Contract owed and payable (including reasonable details with respect to any adjustments), (ii) that the Delivery (as defined in the Highlander Construction Contract) will occur within 5 business days, (iii) that Maersk Oil North Sea UK Limited has provided confirmation that the *Hercules Highlander* has met all "shipyard inspection and commissioning procedures" in the Highlander Contract, other than agreed "action items" to be completed after delivery of the *Hercules Highlander*, (iv) that Jurong has confirmed that the *Hercules Highlander* conforms to the requirements under the Highlander Construction Contract and (v) that the successful completion by the *Hercules Highlander* of the Trials (as defined in the Highlander Construction Contract) has occurred (collectively, the "Escrow Conditions"); *provided* that, if the Company negotiates a different purchase price with Jurong that is acceptable to the Required Lenders |

5

in their sole discretion, the Required Lenders may instruct the Escrow Agent to pay out an amount acceptable to the Required Lenders to the Borrower prior to the satisfaction of the Escrow Conditions (to the extent that the Company negotiates a purchase price lower than the purchase price set forth in the Highlander Construction Contract as of the Closing Date, the Required Lenders may require the prepayment of the First Lien Loans in an amount equal to the difference between the purchase price set forth in the Highlander Construction Contract as of the Closing Date and the new purchase price); *provided further*, if the Company delivers notice to the Escrow Agent and the Agent that the Escrow Conditions cannot be met, the Escrow Agent shall pay out any amounts in the Escrow Account to the Agent to prepay the First Lien Loans.   Upon satisfaction of the Escrow Conditions, 100% of the funds in the Escrow Account shall be distributed to the Borrower or as otherwise directed by the Borrower.

| | |
|---|---|
| *Conditions Precedent to the Closing:* | The closing date (the "Closing Date") under the First Lien Exit Facility shall be subject to conditions set forth in Section 4 of the Commitment Letter. |
| *Representations and Warranties:* | The First Lien Loan Documents will contain representations and warranties customarily found in loan agreements for similar exit financings for similarly situated first lien debt obligations for companies exiting chapter 11 with the amount of leverage and projected EBITDA of the reorganized Debtors and other representations and warranties deemed by the Commitment Parties appropriate to the specific transaction, , in each case giving due regard for the business of the Company and its subsidiaries and their business plan, including, without limitation, accuracy and completeness of financial statements; financial projections; absence of undisclosed liabilities; no Material Adverse Change; organization; corporate existence; compliance with law (including ERISA, margin regulations and environmental laws); corporate power and authority; due authorization; execution and enforceability of the definitive financing documentation; no governmental or third-party approvals; no conflict with law, contractual obligations or charter documents; no material litigation; labor matters, no default under the definitive financing documentation and other material agreements; ownership of property; liens; intellectual property; insurance; taxes; use of proceeds (including prohibition on use in contravention of OFAC/anti-money laundering laws/FCPA/anti-corruption/anti-terrorism laws ("Sanctions Laws"), Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; PATRIOT Act and Sanctions Laws; creation, perfection and priority of security interests; and assets, liabilities and operations with respect to non-Loan Parties. |
| *Affirmative Covenants:* | The First Lien Loan Documents will contain affirmative covenants customarily found in loan agreements for similar exit financings for |

similarly situated first lien debt obligations for companies exiting chapter 11 with the amount of leverage and projected EBITDA of the reorganized Debtors and other affirmative covenants deemed by the Commitment Parties appropriate to the specific transaction, in each case giving due regard for the business of the Company and its subsidiaries and their business plan, including, without limitation, delivery of certified quarterly and audited annual financial statements (provided that the Company's timely 10-K and 10-Q filings shall satisfy this requirement), fleet status reports, reports to shareholders, notices of defaults, litigation and other material events, annual budgets and other information customarily supplied in a transaction of this type, provided that the Lenders agree to keep such information confidential; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation, ERISA and Sanctions Laws) and material contractual obligations; payment of taxes; use of proceeds; maintenance of property and insurance as is customary within the industry after taking into account the particular regions in which the Company and its subsidiaries operate; maintenance of books and records; right of the Lenders to inspect property and books and records; commercially reasonable efforts to maintain a rating on the First Lien Exit Facility by S&P and Moody's; information regarding collateral; vessel classification; rights to earnings from vessels and ownership of vessels, notices related to the construction of the *Hercules Highlander*, regular status updates on the progress of construction of the *Hercules Highlander*, notices of any threatened or actual default under the Highlander Construction Contract or Highlander Contract and the right to appoint a third party project management specialist to oversee construction of the *Hercules Highlander* selected by the Required Lenders and consented to by the Company (which consent shall not be unreasonably withheld or delayed); and further assurances (including, without limitation, with respect to security interests in after-acquired property, ships and rigs and additional guarantors (including with respect to immaterial subsidiaries that become material)).

| | |
|---|---|
| *Negative Covenants:* | The First Lien Loan Documents will contain negative covenants customarily found in loan agreements for similar exit financings for similarly situated first lien debt obligations for companies exiting chapter 11 with the amount of leverage and projected EBITDA of the reorganized Debtors and other negative covenants deemed by the Commitment Parties appropriate to the specific transaction, in each case giving due regard for the business of the Company and its subsidiaries and their business plan, including, without limitation: |

1.  Limitation on dispositions of assets, including limitations on moving collateral out of non-Guarantor subsidiaries;

2.  Limitation on mergers, consolidations, etc.;

7

3.  Limitations on dividends, stock repurchases and redemptions and other restricted payments (including prepayment of junior-lien, unsecured or subordinated debt);

4.  Limitation on indebtedness (including guarantees and other contingent obligations in respect of indebtedness, and including limitations on indebtedness of non-Guarantor subsidiaries); <u>provided</u> that (a) a pari passu letter of credit facility shall be permitted in an amount not to exceed $25.0 million (the "<u>LC Facility</u>"), subject to an intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders and (b) secured indebtedness for borrowed money (other than capital leases and purchase money debt in an amount to be agreed) shall be limited to (i) the First Lien Exit Facility and (ii) indebtedness secured on a junior basis ("<u>Junior Debt</u>") in an amount to be agreed, subject to an intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders;

5.  Limitation on loans, acquisitions and investments, including limitations on loans, acquisitions and investments by non-Loan Parties and from Loan Parties to non-Loan Parties;

6.  Limitation on liens and further negative pledges; *provided* that (a) permitted liens securing the LC Facility will be subject to any intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders and (b) permitted liens securing permitted Junior Debt will be subject to an intercreditor agreement in form and substance reasonably satisfactory to the Required Lenders;

7.  Limitations on transactions with affiliates;

8.  Limitation on sale and leaseback transactions;

9.  Limitations on changes in nature of business;

10. Limitations on restrictions on ability to pay dividends or make distributions; and

11. Limitations on changing fiscal year.

*Financial Covenants:*    The First Lien Loan Documents will contain the following financial covenants:

(a) minimum liquidity at all times of:

- $100.0 million through June 2016

- $75.0 million through December 2016

- $50.0 million through June 2017

- $25.0 million thereafter

(b) maximum first lien secured leverage (defined as gross first lien debt divided by EBITDA) of (i) for the fiscal quarter ending March 31, 2017, 6.00:1.00, (ii) for the fiscal quarter ending June 30, 2017, 5.00:1.00, (iii) for the fiscal quarter ending September 30, 2017, 4.00:1.00 and (iv) for the fiscal quarter ending December 31, 2017 and thereafter, 3.50:1.00. EBITDA shall be calculated on an annualized basis for the fiscal quarters ending March 31, 2017, June 30, 2017 and September 30, 2017, thereafter being based on the prior four fiscal quarters.

*Events of Default:*    The First Lien Loan Documents will contain events of default customarily found in loan agreements for similar exit financings for similarly situated first lien debt obligations for companies exiting chapter 11 with the amount of leverage and projected EBITDA of the reorganized Debtors and other events of default deemed by the Commitment Parties appropriate to the specific transaction, including, without limitation: nonpayment of principal when due or interest, fees or other amounts (subject to grace periods), material breach of representations, breach of covenants (certain of which are subject to grace periods), cross-defaults, actual or asserted loss of lien on collateral above a threshold to be agreed, actual or asserted invalidity of guarantees, bankruptcy and insolvency events, ERISA events, unpaid or unstayed judgments, the Delivery of the *Hercules Highlander* has not occurred within 5 business days after the release of funds from the Escrow Account upon satisfaction of the Escrow Conditions, and certain material and adverse developments with respect to the Highlander Construction Contract and Highlander Contract to be determined by the Required Commitment Parties as set forth in the definitive documentation.

*Assignments and Participations:*    Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its First Lien Loans under the First Lien Exit Facility to Eligible Assignees (to be defined in the definitive documentation). Assignments will require payment by the assignor or assignee of an administrative fee to the Agent and the consents of the Agent and the Borrower, which consents shall not be unreasonably withheld; underline(provided) that (i) such administrative fee shall be payable only once in the event of simultaneous assignments to or by two or more entities that are administered or managed by the same entity or entities that are affiliates of each other, (ii) no consents of the Agent or the Borrower shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrower shall be required during a default or event of default. For any assignment for which the Borrower's consent is required, such consent shall be deemed to have been given if the Borrower has not responded within five business days of a request for such consent. In addition, each Lender may sell participations in all

9

or a portion of its First Lien Loans under the First Lien Exit Facility; <u>provided</u> that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the First Lien Exit Facility (except as to certain basic issues).

*Indemnification and Expenses:*

Each Loan Party will indemnify the Agent, the Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the First Lien Exit Facility or the transactions contemplated thereby; <u>provided</u> that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its gross negligence or willful misconduct.  In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of one law firm acting as outside counsel, any local counsel and special counsel reasonably necessary, and one financial advisory firm for the Lenders and reasonable and documented fees, disbursements and other charges of one law firm acting as outside counsel and any local counsel and special counsel reasonably necessary for the Agent) of the Agent and Lenders in connection with the First Lien Exit Facility and the transactions contemplated thereby shall be paid by the Loan Parties from time to time, whether or not the Closing Date occurs and (b) all out-of-pocket expenses (including, without limitation, documented fees, disbursements and other charges of outside counsel and financial advisors) of the Agent and the Lenders, for enforcement costs and documentary taxes associated with the First Lien Exit Facility and the transactions contemplated thereby will be paid by the Loan Parties.

*Required Lenders:*

Lenders holding at least a majority of the total First Lien Loans under the First Lien Exit Facility (the "<u>Required Lenders</u>"), with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total First Lien Loans under the First Lien Exit Facility.  The First Lien Exit Facility shall be subject to customary "yank-a-bank" provisions satisfactory to the Commitment Parties.

*Miscellaneous:*

The First Lien Loan Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and

10

jury trial, (iii) customary agency, set-off and sharing language and (iv) customary confidentiality provisions.

*Governing Law and Submission to Non-Exclusive Jurisdiction:*    State of New York.

*Counsel to Commitment Parties*    Akin Gump Strauss Hauer & Feld LLP.